John S. Gleason
Arizona State Bar
Independent Bar Counsel.
Colorado Supreme Court
Office of Attorney Regulation Counsel
1560 Broadway, Suite 1800
Denver, Colorado 80202
(303) 866-6400

**BEFORE THE PROBABLE CAUSE PANELIST
OF THE STATE BAR OF ARIZONA**

| | |
|---|---|
| **In the Matter of Members of the State Bar of Arizona,**<br><br>**Andrew Thomas, Lisa M. Aubuchon and Rachel R. Alexander** | **Smith v. Thomas, 09-2293;**<br>**State Bar v. Thomas, 10-0423;**<br>**Smith v. Aubuchon, 09-2296;**<br>**State Bar v. Aubuchon, 10-0663;**<br>**Smith v. Alexander, 09-2294;**<br>**State Bar v. Alexander, 10-0664**<br><br>**Independent Bar Counsel's Report of Investigation and Request for Authority to File Formal Complaint** |

Independent Bar Counsel, John S. Gleason, Regulation Counsel for the Colorado Supreme Court, acting by appointment of Rebecca White Berch, the Chief Justice of the Arizona Supreme Court, as set forth in her Administrative Order No. 2010-41 entered March 23, 2010, respectfully submits his Report of his investigation of respondent Andrew P. Thomas ("Thomas"), Lisa M. Aubuchon ("Aubuchon") and Rachel R. Alexander ("Alexander"). Pursuant to Arizona Rules of the Supreme Court 54(b)(2), Independent Bar Counsel recommends the filing of a formal complaint against Thomas, Alexander and Aubuchon and requests that the Probable Cause Panelist approve the recommendation. Colorado Supreme Court Office of Attorney Regulation Chief Deputy Regulation Counsel James Sudler assisted Independent Bar Counsel with the investigations. Independent Bar Counsel interviewed approximately

one hundred individuals, reviewed thousands of pages of documents, and reviewed extensive pleadings and grand jury transcripts.   Independent Bar Counsel offered Thomas, Aubuchon and Alexander each the opportunity to be interviewed about the matters discussed herein; none of them took that opportunity.

The respondent lawyers filed multiple motions and requests with the Probable Cause Panelist and the Arizona Supreme Court in an effort to limit, block or delay the investigations. Additionally, the respondent lawyers filed multiple actions in an effort to block access to their responses.  All of the actions failed.

Independent Bar Counsel states as follows.

## I.  JURISDICTION

Andrew P. Thomas was admitted to the Bar of the State of Arizona on October 26, 1991.  His Bar Number is 014069.  Lisa M. Aubuchon was admitted to the Bar of the State of Arizona on October 27, 1990.  Her Bar Number is 013141. Rachel R Alexander was admitted to the Bar of the State of Arizona on May 19, 2000. Her Bar Number is 020092.  Thomas, Aubuchon and Alexander are each subject to the jurisdiction of the Arizona Supreme Court pursuant to Arizona Rules of the Supreme Court 31.

## II.  INTRODUCTION

Andrew Thomas was elected Maricopa County Attorney in 2004.   He was reelected in 2008.  He resigned from that office effective on April 6, 2010, in order to run for Arizona Attorney General.

Lisa Aubuchon began working at the Maricopa County Attorney's Office in 1996.  In summer 2010 she was placed on administrative leave and was terminated by Interim County Attorney Rick Romley in October 2010.

Rachel Alexander worked in the Maricopa County Attorney's Office from about 2005 to 2010.

This report concludes that Thomas, Aubuchon and Alexander committed serious misconduct.  Independent Bar Counsel recommends that the Panelist find that there is probable cause to file a formal complaint against Thomas, Aubuchon and Alexander.[1]  Pursuant to the American Bar Association Standards for Imposing Lawyer Sanctions, the allegations of misconduct committed by Thomas and Aubuchon, if proven, warrant disbarment.[2]

## III. ALLEGATIONS OF ETHICAL MISCONDUCT

### A.  Summary

In November 2008 Thomas and Aubuchon charged a county supervisor, Donald Stapley, with 118 counts of criminal activity involving his failing to file appropriate financial disclosures dating back to 1994.  In December 2009, Thomas, Aubuchon and Alexander pursued a federal civil RICO action alleging a criminal conspiracy among 14 individuals including supervisors, superior court judges, county employees and private attorneys, all of whom had been involved in disputes

[1] **REDACTED BY COUNSEL**

[2] ABA *Standards* § 5.21 states that disbarment is generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another, or with the intent to cause serious or potentially serious injury to a party or to the integrity of the legal process.

and disagreements with Thomas and Sheriff Arpaio.  In December 2009, Thomas and Aubuchon charged another county supervisor, Mary Rose Wilcox, and filed additional criminal violations against Supervisor Stapley.   In December 2009, Thomas and Aubuchon also filed charges against a Superior Court Judge, Gary Donahoe.  As set forth in this Probable Cause Statement, there is reason to believe that Thomas, Aubuchon and Alexander pursued these actions not in order to seek justice, but to retaliate against those who had made decisions contrary to Thomas's perceived interests.[3]   Besides filing and pursuing these cases, Thomas and Aubuchon committed various other acts that involved attorney misconduct.   Their actions violated various Arizona Ethical Rules as described below.

### B. Thomas's Disputes with Courts and Board of Supervisors

About a year after Thomas assumed office as County Attorney, disputes began between him and the judges of the Superior Courts.  He also had disputes with the Maricopa County Board of Supervisors (referred to herein as "the Board" or "MCBOS") beginning no later than early 2006.  These disputes are relevant because in December 2008 and December 2009 Thomas and Aubuchon charged individuals with whom they disagreed with various crimes.   In December 2009, Thomas, Aubuchon and Alexander also filed a federal RICO action against many of the people involved in these disputes.

---

[3] ABA Criminal Justice Standards, § 3-1.2 states: The duty of a prosecutor is to seek justice, not merely to convict.

4

***Disputes with Superior Courts.*** Mr. Thomas admitted that tension between him and the Maricopa County Judiciary began in 2007 over immigration issues.[4] This tension can be seen earlier, however. Thomas and others filed a lawsuit against Judge Barbara Mundell and other officers of the Superior Court in federal district court in February 2006 (Case no. CV-06-00598-PHX-EHC). Thomas alleged that certain post-sentencing probation programs adopted and supervised by the superior court violated his federal constitutional and statutory rights. That matter was dismissed by the trial judge and Thomas appealed to the Ninth Circuit Court of Appeals. *Thomas v. Mundell*, 572 F.3d 756 (9th Cir. 2009). In that lawsuit Thomas challenged the establishment of Spanish-speaking DUI courts, which were established in 2002. Judge Mundell was Presiding Judge of the Maricopa County Superior Courts. Later she was also one of the defendants named by Thomas in what is now commonly known as the RICO case filed in December 2009. *See* pp. 45-56 below. The Ninth Circuit Court of Appeals held that Thomas did not have standing to bring this action against the courts. The Court of Appeals upheld the trial court dismissal of the lawsuit. Thomas's lack of standing to bring a lawsuit was raised again in two cases discussed below, the "Sweeps" case and the "RICO" case. He was found to have no standing to bring the Sweeps case and his lack of standing was raised as a defense in the RICO case.

Thomas also disagreed with the Superior Courts about Proposition 100 and its application. This law effectively denies bail to persons charged with a crime who are in the U.S. illegally. Thomas took the position that the courts were not enforcing the

---

[4] RICO Complaint paragraph 31, described below.

law and he was vocal in the press about this.  On June 17, 2007, Judge Mundell published an article in the Arizona Republic stating that Thomas had an obligation to work through the courts, including appellate courts, if he did not agree with the way the courts were implementing Prop. 100.  She stated that prosecutors (in Thomas's office) had created a politically motivated controversy, using the media to agitate the public.  She stated that Thomas's criticism was unfounded and unfair.  On about June 22, 2007, Thomas filed a Special Action concerning this issue.  This lawsuit was dismissed soon after when a new law signed by then-governor Napolitano established probable cause as the evidentiary standard to be applied to determine an immigrant defendant's status.

In December 2008, Thomas and Aubuchon filed criminal charges against Supervisor Donald Stapley.  At the outset of that case, they alleged in letters and pleadings that Judge Mundell, Judge Baca and Judge Fields were assigning the case to Judge Fields because he was biased against Thomas.  They also alleged that Judge Donahoe improperly handled a case involving Conley Wolfswinkle.  They claimed that Judge Donahoe took the case when he should not have done so.

**Disputes with MCBOS**.  In or about March 2006, a dispute developed between Thomas and the Board over the appointment of lawyers from outside MCAO to represent the county.  Occasionally, the county must be represented by an attorney other than the elected county attorney due to conflicts of interest or other issues.

In early 2006 the Board believed that Thomas was making these appointments for political reasons.  The Board perceived that Thomas' appointments were based upon who was favorable to him, not necessarily upon who was best qualified to

6

represent the county.  Additionally, the Board was concerned that the money spent on outside counsel was increasing above what was acceptable.  Supervisor Stapley was chair of the Board at this time and the Board asked him to talk to Thomas about this situation.  Stapley and Thomas met and Stapley explained the Board's concerns. Stapley and Thomas did not reach an agreement about the Board's authority over the appointment of outside counsel.

Thomas then wrote a series of letters to Stapley about this dispute.  On March 2, 2006, Thomas wrote to Stapley stating among other things that he could not agree to allow the Board to make the selection of counsel independently or to retain counsel outside MCAO.   Stapley had taken the position that the Board had supervisory authority over attorneys representing the county.  The Board also wanted to determine which counsel to hire if the County Attorney had a conflict.

On March 13, 2006, Thomas again wrote to Stapley about this subject.  He stated, ". . . let me emphasize once again that the Board of Supervisors does not have the lawful authority to retain its own legal counsel outside the County Attorney's Office, and that I have neither the authority nor the intention to consent to such an arrangement."  Thomas further said that he would not meet again with Stapley if Stapley wanted to discuss retention of private outside counsel.  He also stated that a proposed resolution of the Board to appoint General Counsel separate from the County Attorney was unlawful and that if the Board did so it would be a violation of Arizona statutes and case law.  He then stated that Board members are immune from suit when they rely in good faith upon opinions of the County Attorney, but no such immunity would apply and they may be personally liable for actions on advice of

other counsel.  He stated he would be obliged to commence litigation against the Board should the Board move forward to pay outside counsel.

A week later, on March 20, 2006, Thomas wrote to Stapley and stated that he had learned that the Board planned to meet in executive session that day.  He also learned that attorney Tom Irvine[5] had attended a Board meeting on March 15, 2006, as "Outside Counsel."  Thomas stated that the County Attorney had not retained Mr. Irvine to represent the Board in the matter, and that Mr. Irvine could not provide legal advice to the Board in either executive or open session.  Thomas instructed his civil division to delete Mr. Irvine from the agenda.  Thomas wrote that his letter to Mr. Stapley was to provide legal advice to the Board.  He stated that the Board was entitled to separate legal counsel in only two limited situations: 1) if the County Attorney's Office is unwilling or unable to represent the Board (which he claimed was not the case); or 2) if there was an actual conflict of interest.  He claimed that mere disagreement by the Board with the County Attorney's opinion does not constitute a conflict of interest.  He said no conflict existed.  He requested that the Board not utilize Mr. Irvine in executive session that day.  Nevertheless, Mr. Irvine attended that meeting at the invitation of the Board.

On April 17, 2006, Thomas wrote to Stapley stating that the Board could not amend the County Restated Declaration of Trust to allow the Board to select private counsel for civil litigation.  The Board planned to amend the Declaration of Trust concerning the self-insurance of the county to give itself more control over which

---

[5] Mr. Irvine was also named as one of the defendants in the RICO action by Thomas and Aubuchon, as discussed below.  Thomas and Aubuchon have also claimed that Mr. Irvine was a target of a grand jury investigation in December 2009.

lawyers would be selected. Thomas stated that his opinion was that the Board could not select counsel to defend civil lawsuits without the consent of the County Attorney's Office. He wrote,

> It would be contrary to law for the Board to seek to exclude the county attorney from the process of selecting counsel for opposing claims against the county. Accordingly, should the Board seek to take this action, our office would be obliged to initiate litigation. As in my earlier correspondence to you on these matters, this legal advice is offered merely in an attempt to explain the full legal consequences of the proposed action.
>
> I have decided to assign outside counsel to provide legal advice to the Board on the sole issue of the legality of this proposed action, and to defend against any lawsuit this office may initiate related to same. Because our office did not learn of this possible action until late last week, I have been unable to secure outside counsel prior to the executive session scheduled for today. As I explained in regard to Mr. Irvine's recent improper actions, you or other Board members should not solicit legal advice from this counsel on unrelated matters. I will instruct this counsel not to provide such advice. You will be informed of which counsel has been selected for this matter in the near future. . .

The Board placed its proposed action on its agenda, and on May 18, 2006, the Board did amend the Revised Restated Declaration of Trust for Maricopa County. In a letter to Stapley on May 23, 2006, Thomas said that the Board had acted to give itself the authority to manage, supervise and direct the County Attorney in the exercise of his duties. He stated that it was inconceivable that the Board would be permitted to veto a decision made by the County Attorney pursuant to a clear statutory mandate. He further stated the following:

> Finally, the immunity granted to the Board by A.R.S. § 38-446 requires "good faith reliance on written opinions of . . . a county attorney." Here, the Board has acted contrary to the written

opinions of this office and will not be entitled to immunity if it acts in accordance with the invalid Trust Agreement.

Concerning the appointment of lawyers outside the county attorney's office, Thomas viewed his rights and obligations and those of the MCBOS in one way; MCBOS viewed them differently. Thomas wanted to make appointments on his own, unimpeded by the Board.

In the above series of letters, Thomas advised his client, MCBOS, about how his client should conduct itself in choosing counsel to represent it. Thomas's advice concerned issues in which Thomas's personal interest and his interest as County Attorney conflicted with the interests of his client. Nonetheless, Thomas counseled his client not to take action that would compromise his own personal interests.

### 1.   Ethical Violation #1
### (Thomas) Conflicts of Interest[6]

When he advised the Board about its rights and obligations in the appointment of outside counsel, Thomas violated ER 1.7(a)(2). That rule provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by the personal interest of the lawyer.

---

[6] Each Ethical Violation charged herein is numbered separately and follows the relevant factual discussion.

Thomas advised the Board about matters in which he had a vested personal interest.  He wanted to maintain the power to make the appointments of outside counsel without the involvement of the Board.  The Board, however, wanted the power to make those decisions.  Thomas advised the Board that it could not do what it wanted to do.  This advice was limited by his own personal and political interests as County Attorney.  Thomas violated ER 1.7(a)(2).

### C. *Thomas v. Maricopa County Board of Supervisors, and Thomas's Statement regarding Dowling v. County and Keen v. County.*

The dispute between MCBOS and Thomas about appointment of outside counsel continued.  On June 14, 2006, Thomas filed a civil action against the Board seeking a declaratory judgment concerning the relative rights and obligations of the County Attorney and the Board about selection and appointment of outside private counsel.  *Thomas v. MCBOS*, Maricopa County Superior Court, CV 2006-008971.  MCBOS was represented in this lawsuit by Tim Casey.

On June 14, 2006, the same day that he filed the action against the Board, Thomas released a public statement that he was suing MCBOS.  He stated that he was doing so "to defend the County Attorney's Office against the board's unlawful attempts to undermine the independence of the office that I hold."  Thomas stated that he had discussed on numerous occasions his concerns with all five supervisors and had sent Stapley, the chairman of the Board, no fewer than five letters making plain the illegality of "his" proposed actions.

The Board did not file an answer, and the matter was resolved in August 2006 by a Memorandum of Understanding (MOU) between the parties. The MOU contains the following agreement:

> The Board agrees, to the extent the law permits, not to file any lawsuit, complaint, or action that in any manner or in any way arises from, or is related to, the complaint, the County Attorney's Statement dated June 14, 2006, or the conduct of the County Attorney between June 14, 2006 and the date this MOU is signed by the parties.

County Manager Smith alleges in his Bar complaint (State Bar No. 09-2293) that Mr. Thomas obtained the agreement of the Board not to file a Bar complaint against Thomas, as reflected in the above passage.  In the MOU Thomas agreed that he would dismiss the action and that he and MCBOS would follow a system with regard to appointment of outside counsel.  The MOU expired by its terms on December 1, 2008.

In 2006, while the above dispute was occurring, two County officers sued the County.  Sandra Dowling, the County School Superintendant, filed one lawsuit, and Philip Keen, the County Medical Examiner, filed the other.  Thomas hired Tom Irvine to defend the County in the Dowling case.  The County hired other outside counsel to represent it in the Keen case.

Thomas's June 14, 2006 statement addressed not only the suit Thomas brought against the Board, but also the cases brought by Dowling and Keen. Thomas stated that the County's position in those two cases was unsupportable, despite the fact that Thomas had an attorney-client relationship with the Board. Thomas added that his suit against the County was not unique and that it was the third, including his, against County officers in less than a month.  He stated that in

12

all three cases the Board had unlawfully sought to arrogate powers vested in other County agencies.  He said that he could not in good conscience defend MCBOS in the Dowling and Keen actions and that he believed those complaints had merit:

> It bears noting that these recent lawsuits [against the county] had occurred during, and largely because of, the unusual chairmanship of Supervisor Don Stapley.  **While respecting the attorney-client relationship I hold with Mr. Stapley and other members of the board,** I would be remiss if I did not help the people of Maricopa County understand why the board has attracted so many costly lawsuits in such a brief period of time.

> I cannot in good conscience defend the Board of Supervisors in the two legal actions brought by Ms. Dowling and Mr. Keen, as I believe these complaints [against the county] have merit. (emphasis added)[7]

Dowling's lawyers, David Cantelme and Aaron Brown, filed a Motion for Summary Judgment in her case against the County on about June 9, 2006.  On June 16, 2006, after Thomas made his public statement, Dowling's attorneys filed a Motion for Leave to Supplement [Dowling's] Statement of Facts asking to include Thomas's June 14, 2010 statement.  After the County objected, Judge Margaret Downie did not permit Thomas's statement into evidence.

### 1.    Ethical Violation #2
### (Thomas) Disclosure of Confidential Information

Thomas violated ER 1.6(a) by publicly revealing information relating to the representation of a client.  The rule states that a lawyer shall not reveal information

---

[7] Thomas and Aubuchon later charged Supervisor Stapley and Supervisor Wilcox with crimes.  They also investigated Supervisor Kunasek.  Thomas and Aubuchon named all of the supervisors as defendants in the RICO action described below.

relating to the representation of a client unless the client gives informed consent. There are exceptions to this general rule that are not applicable. Thomas violated ER 1.6(a) by disclosing his opinion that the county's positions in these two lawsuits were unsupported. Trust is the hallmark of the attorney client relationship. ER 1.6 cmt. 2. Thomas violated this trust by publicly revealing his opinion of his client's conduct. Even though the County was represented by lawyers outside the County Attorney's Office in the Keen and Dowling cases, the County Attorney still had an attorney-client relationship with the Board and the County itself. Thomas formed his opinion based on his view of his client's rights and obligations. If Thomas actually thought the County's position was unsupportable, he should not have made any public statement about his views of his client's case. Instead, Thomas used the Dowling and Keen cases in an attempt to buttress his own position against the Board and the County.

### 2.      Ethical Violation #3
### (Thomas)  Improper Public Statements

Thomas violated ER 3.6(a) by issuing his public statement about his view of the Keen and Dowling cases. He made extrajudicial statements that he knew or reasonably should have known would be disseminated by means of public communication and would have a substantial likelihood of materially prejudicing an adjudicative proceeding. The information was not permitted to be disclosed under the exceptions to the general rule contained in ER 3.6(b).

14

### D. Prosecution of Supervisor Stapley.

As outlined above, in 2006 Thomas began to see Supervisor Stapley as a foe. In late 2008, Thomas and Aubuchon filed criminal charges against Stapley.[8]

Aubuchon presented this case to a grand jury. The grand jury returned an indictment and it was filed in court on November 20, 2008. On about December 3, 2008, a summons was served on Stapley. The 118 count indictment charged Stapley with felonies and misdemeanors regarding his yearly financial disclosures as a county supervisor and his periodic candidate disclosures dating back to 1994. An attorney for MCAO argued for the issuance of a warrant and the setting of a bond in the amount of $100,000. A commissioner denied that request and ordered the issuance of a summons to Stapley. During a hearing about whether a summons or warrant requiring bond should be issued to Stapley, a commissioner recognized that there was a statute of limitations issue.

Thomas's written press release about the Stapley indictment stated that the case was the result of investigations by the joint anti-corruption task force with the Sheriff (Maricopa County Anti-Corruption Effort, "MACE"). Thomas announced that the investigation was not over and that other county employees were also being investigated.

Although Independent Bar Counsel has offered Aubuchon and Thomas the opportunity to be interviewed in this matter, neither has accepted. Therefore, Independent Bar Counsel bases conclusions about when and why the Stapley

---

[8] *State v. Stapley*, CR2008-009242.

investigation began on what was learned from sheriff's office personnel and inferences from known facts.

No reason or explanation has been given to Independent Bar Counsel why the investigation of Stapley was commenced.   The evidence does not support the conclusion that the investigation began as a result of a tip or some information being given to MCSO or MCAO about possible criminal activity.   Rather, in 2007, the joint task force between Thomas's office and the Sheriff's Office began to look into Stapley's business dealings and his financial disclosures on their own initiative.   Chief Hendershott of the Sheriff's Office asked Sgt. Brandon Luth of the Sheriff's Office to start looking at Stapley in January 2007, but to keep it confidential.   Aubuchon, if not another deputy county attorney, began in January 2007 to research Stapley on the Internet.

Aubuchon stated in a pleading in the case that the matter was not initiated through a confidential informant.[9]   However, in that pleading she refused to disclose who initiated the investigation or why it was initiated.   She did state that much of the evidence implicating Stapley was readily available through proper search of the Internet.[10]   Her statement is important because, as noted above there is evidence that Aubuchon herself initiated an investigation of Stapley by downloading documents from the Internet as early as January 2007.   If she did not initiate this investigation herself, then it is likely that former deputy county attorney Mark Goldman did so.

[9] State's Response to Defendant's Motion to Disqualify Maricopa County Attorney Andrew Thomas For Improper Bias and Prejudice, p. 4, filed February 9, 2009.
[10] *Id.*

Goldman has been identified as attending MACE meetings and handing out information about Stapley at one of those meetings in 2007.[11]

The substance of the indictment returned by the grand jury against Stapley at the direction of Aubuchon is itself evidence of Thomas's and Aubuchon's personal and political attack on Stapley.   The Indictment charges 118 separate criminal violations dating back to 1994.  It appears that this was the first time in Arizona history that a county supervisor's financial disclosures were the subject of criminal charges.  As discussed below, Thomas and Aubuchon brought more than 40 of these charges against Stapley after the statute of limitations had run.  While prosecutors have broad discretion to charge, the fact that Thomas and Aubuchon charged crimes they knew were outside the statute of limitations and the fact that they charged so many crimes, including felonies of forgery and perjury, for essentially the same types of acts and omissions is evidence of their motive to retaliate, harm and burden Stapley.

1.  **Ethical Violation #4**
    **(Thomas and Aubuchon) Filing Charges Against Stapley to**
    **Embarrass or Burden**

ER 4.4(a) states that in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person.  Thomas and Aubuchon each violated this rule.  There was no substantial purpose to file the charges against Stapley other than to burden and embarrass him.

---

[11] Mark Goldman is currently practicing in the Wilenchick law firm, and up until recently has represented Aubuchon in this Bar complaint.

1  Thomas and Aubuchon did not prosecute Stapley to seek justice but rather to pursue

2  the political and personal interests of Thomas.

3      Thomas's and Aubuchon's motives to attack Stapley date back to at least

4  March 2006, when, as noted above, Thomas blamed "the unusual chairmanship of

5  Supervisor Stapley" for various lawsuits against the county, including the one

6  brought by Thomas against the Board.

7      There is further evidence of tension between Thomas and Stapley regarding the

8  Arizona Meth Project that had been implemented through the Board and Stapley.

9  Before this project, anti-drug television ads had featured Thomas as a figurehead

10 discouraging the use of methamphetamines.   At the direction of the Board and

11 Stapley, the television spots were changed to exclude Thomas in favor of an anti-

12 meth message based on the effects of the drug.  The Board thought that Thomas had

13 been using the previous ads for political gain rather than for the purpose of

14 discouraging drug use.  According to Stapely, Thomas was not happy about this

15 change, which was spearheaded by Stapley.

16     Additionally, there were disputes between the Board, including Stapley, on one

17 side and Thomas and Sheriff Arpaio on the other during the time period before

18 Stapley was indicted.   The Board had initiated a freeze on capital spending and

19 Thomas and the Sheriff had refused to work with the Board on this issue.

20     Thomas and Aubuchon had several political motives for charging Stapley.  As

21 noted above, Thomas had identified him as the supervisor whose "unusual

22 chairmanship" of the Board had led to the county being sued.  Thomas also identified

23 Stapley along with other Board members as threatening Thomas's power to appoint

18

attorneys to represent the County without interference by the Board.  At the time he was indicted, Stapley was the Chair of the Board.  All of this evidence indicates that the 118 count indictment against Stapley was politically motivated to burden and embarrass Stapely.

2.    **Ethical Violation #5**
      **(Thomas and Aubuchon) Conflicts of Interest**

Thomas and Aubuchon violated ER 1.7(a)(1) because they represented one client, the State, against another client - Supervisor Stapley - in the criminal case against Stapely.  Even Thomas himself recognized that he had an attorney-client relationship with Stapley.[12]  Thomas never terminated that relationship and never advised Stapley about the conflict or sought a waiver.

Thomas and Aubuchon also violated ER 1.7(a)(2) in charging and prosecuting Supervisor Stapley.  The rule provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest is defined as existing if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person *or by the personal interest of the lawyer.* (Emphasis added.)  The evidence establishes that Thomas and Aubuchon did have a personal conflict of interest in deciding whether to seek an indictment of Stapley, and later in prosecuting the matter against him.

---

[12] *See* news release of June 14, 2006, quoted above at page 13.

client relationship as he termed it for purposes of analyzing Thomas's and Aubuchon's professional responsibility.[16]   Once Thomas had an attorney-client relationship with Stapley, Thomas and Aubuchon could not then bring charges against him.  The pleadings in the Stapley case do not indicate that Judge Fields was advised that Thomas himself acknowledged his attorney-client relationship with Stapley.

**Misrepresentation to Court re: "Chinese Wall".**  On December 23, 2008, Stapley's attorney Tom Henze filed a Motion for Determination of Counsel and Motion for Scheduling Order.  The Motion for Determination of Counsel argued that Thomas should be disqualified as the prosecutor because of a conflict of interest under ER 1.7, and that his actions had the appearance of impropriety.   That issue was resolved, as discussed above.  The motion argued that Thomas and his office should not be permitted to prosecute Stapley because there had been an attorney-client relationship between MCAO and Stapley.

Aubuchon filed a response to the motion arguing among other things that the case against Stapley was based upon public records only, and that there was a "Chinese Wall"[17] between the criminal and civil divisions of the County Attorney's Office in the prosecution of the case.[18]  There is no evidence of any formal screening

---

[16] ER 1.2(c) does allow an attorney to limit the scope of the representation; however, the client must give informed consent to that limitation.   There is no evidence that MCAO ever tried to limit its representation of any supervisor or obtained informed consent to such limitation.   Additionally, such limitation must be reasonable under the circumstances.

[17] The term "Chinese Wall" is more properly referred to as "screening" to describe how attorneys can be isolated from involvement in a particular case.

[18] State's Response to Motions for Determination of Counsel and Scheduling Order, p. 7, lines 4-6: "There has been and is a "Chinese wall" between the criminal and civil division of the County Attorney's Office in the prosecution of this case."

of some lawyers from others in the county attorney's office.  Some lawyers have said that there was no discussion between the two divisions; however, there is no evidence of a formalized or written screening policy ever being implemented in general or in particular about *Stapley I*.  Aubuchon's claim that such a formalized policy existed was implicit in Aubuchon's pleading.  Aubuchon's statement to the court was dishonest and a material misrepresentation because it implied that the County Attorney had established screening precisely to guard against information being shared by the civil division with the criminal division, and vice versa.

### 3.     Ethical Violation #6
### (Thomas and Aubuchon) Misrepresentation to Court

Aubuchon violated ER 3.3(a) because she knowingly made a misrepresentation of fact to the court.  She stated to the court in a pleading that a "Chinese Wall" had been created between the civil and criminal divisions of the county attorney's office.  There is no evidence that there was ever such formalized screening.  To the contrary, there was no policy to shield the criminal lawyers handling the Stapely case from any lawyer in the civil division including those advising Stapley and other supervisors.  Aubuchon's statement to the contrary was dishonest and self-serving.    Thomas    is equally culpable for this misrepresentation to the court because, according to Aubuchon, everything that she filed in court was approved by the County Attorney.[19]

---

[19] Baker interview of Aubuchon, June 21, 2010, p. 27.

1   ***Motion to Recuse Judge Fields from the Stapley Case.*** After the *Stapley I*[20]

2   case was filed, Judge Mundell assigned it to retired Judge Kenneth Fields. Thomas

3   and Aubuchon asserted that the assignment of Judge Fields to the *Stapley I* case was

4   made because Judge Fields was biased against Thomas. On December 10, 2008,

5   Aubuchon, on behalf of Thomas, filed a Motion for Voluntary Recusal Or If Denied

6   Motion for Change of Judge For Cause. In her motion Aubuchon stated that Judge

7   Mundell and Stapley had worked together closely on numerous fiscal and countywide

8   issues. Aubuchon stated that Judge Mundell had recently negotiated with Stapley

9   about the funding for the county court tower. Aubuchon alleged that Judge Mundell

10  had interjected herself into the Stapley case and had chosen Judge Fields who had a

11  history of bias and prejudice as well as judicial activism against Thomas and his

12

13  office.

14      In her motion Aubuchon stated, "Judge Fields is the complainant in an open

15  and pending State Bar matter that he initiated against County Attorney Thomas."[21]

16  Aubuchon knew that this statement was untrue because she attached to her motion

17  Judge Fields's letter to the Bar regarding attorney Dennis Wilenchik. This letter was

18  not about Thomas. Judge Fields never initiated a State Bar matter against Thomas.

19  Aubuchon had no evidence that Judge Fields had filed a bar complaint against

20  Thomas. Aubuchon's statement was a knowing misrepresentation to the court.

21

22

23

24  _____

[20] This case, CR2008-009242, is referred to as "*Stapley I*" to distinguish it from a second criminal case
25  Thomas and Aubuchon filed against Stapley in December 2009.
[21] State's Motion for Voluntary Recusal, p.6, Dec. 10, 2008, CR2008-009242.

### 4.   Ethical Violation #7
### (Thomas and Aubuchon) Misrepresentation to the Court

Aubuchon violated ER 3.3(a) because she knowingly made a misrepresentation of fact to the court. The rule prohibits a lawyer from knowingly making a false statement of fact to a tribunal. Aubuchon stated that Judge Fields had initiated a state bar complaint against Thomas when he had not. Aubuchon had no evidence to support the claim. The letter she attached to her pleading was not about Thomas, but was about another attorney, Dennis Wilenchick. Thomas is equally culpable for this misrepresentation to the court because, according to Aubuchon, everything that she filed in court was approved by the County Attorney.[22]

*Aubuchon Sends Letters Directly to the Court.* On about December 11, 2008, Aubuchon wrote to Presiding Criminal Judge Anna Baca requesting that she submit to an interview about the reasons for the selection of retired Judge Fields in *Stapley I.* Judge Baca responded by order on about December 16, 2008, stating that the court declined to accept or read the letter from the County Attorney since such an off-the-record communication may relate to the case. She directed that the County attorney communicate in pleading form.

On about December 11, 2008, Aubuchon hand delivered a letter to Judge Mundell requesting to interview her about the assignment of Judge Fields.[23] Judge Mundell responded on December 15, 2008, stating that among other things lawyers do not write letters that are not part of the public file; rather, they file motions.

---

[22] Baker interview of Aubuchon, June 21, 2010, p. 27.
[23] Aubuchon's letter showed that Stapley was copied on it. At that time no attorney had entered an appearance for Stapley.

1  Judge Mundell also stated that it was not appropriate for Aubuchon to attempt to

2  ascertain Judge Mundell's thought processes in making a judicial decision.[24]

3  Contrary to Thomas's and Aubuchon's assertions, Judge Mundell was not and

4  is not aware of any bias by Fields against Thomas or in favor of Stapley.   Judge

5  Mundell explained to Independent Bar Counsel that her choice of a retired judge was

6  based upon her concern about a potential conflict because of budget problems

7  affecting sitting judges that would ultimately be decided by the Board.   A retired

8  judge would not have a concern about those problems and would not have the

9  appearance of doing something to favor one of the supervisors.   She had two judges

10  in mind and chose Fields because he called her back before the other judge did.

11

12  **5.    Ethical Violation #8**
    **(Aubuchon) Conduct Prejudicial to Administration of Justice**

13  Aubuchon violated ER 8.4(d) in her contacts with the judges and in her

14  attempts to determine why Judge Fields had been appointed to *Stapley I.*   Aubuchon

15  requested by private letter to interview or depose Judges Mundell, Baca and Fields

16  concerning their thought processes in the assignment of Judge Fields to the *Stapley I*

17  case.   The proposed inquiry intruded into judicial discretion and had the potential to

18  undercut the separation of powers between the judicial and executive branches of

19  Maricopa County government.   The proposed depositions (with questions concerning

20  whether the Judges had conspired to appoint a Judge supposedly biased against

21  Thomas) also had the potential to intimidate the Judges and other judges of the

22  Superior Court.

23

24

25  [24] Judge Mundell, Judge Baca and Judge Fields were later named as defendants in the RICO action by Thomas and Aubuchon.

26

1    By requesting interviews of and moving for depositions of the Judges,

2  Aubuchon engaged in conduct prejudicial to the administration of justice (ER 8.4(d)).

3    ***Charging Stapley With Crimes Outside the Statute Of Limitations.*** The

4  evidence will show that Thomas and Aubuchon charged many of the misdemeanor

5  crimes alleged in the indictment against Stapley knowing that the statute of

6  limitations had run on those misdemeanors.  The statue of limitations, A.R.S. § 13-

7  107, provides:

> (b) Except as otherwise provided in this section, prosecutions for
> other offenses [i.e., homicide, violent sexual assault, among others]
> must be commenced within the following periods after actual
> discovery by the state or the political subdivision having
> jurisdiction of the offense or discovery by the state or the political
> subdivision that should have occurred with the exercise of
> reasonable diligence, whichever first occurs:
>
> 1. For a class 2 through a class 6 felony, seven years.
>
> 2. For a misdemeanor, one year.

15

16    The investigation of Stapley began as early as January 2007.  Brandon Luth, a

17  Maricopa County Sheriff's Department Sergeant, stated that he was told by Chief

18  Hendershott to look into Stapley on January 23, 2007.  Hendershott told Luth that

19  he wanted to look into the business dealings of Don Stapley.  Luth stated that he

20  researched Stapley's business holdings and dealings for a couple of days in January

21  2007, and then stopped.  Luth also remembers being asked in September 2007 about

22  his investigation of Stapley.  Sgt. Luth has stated that he knew there was a statute of

23  limitations issue in the Stapley case when the charges were filed by Thomas and

24  Aubuchon.

25

The evidence will show that Aubuchon began investigating Stapley's financial disclosures in January 2007. The evidence of her involvement is as follows:

Mark Stribling, who is now Chief of Investigations of MCAO, was contacted by Thomas in early May 2008 and asked to work on an investigation of Stapley. Thomas told Stribling that he would be working with Luth. Stribling stated that he was provided no information of how any of the information about the case came to the attention of MCAO, but Thomas told him that Aubuchon had done Internet searches on the properties owned by Stapley or his affiliates and that Aubuchon would be the prosecuting attorney.

On May 14, 2008, Aubuchon, Luth, Stribling, another investigator from MCAO (Tadlock), MCSO Captain James Miller, and MCSO Lieutenant Anglin attended a meeting. Aubuchon handed out documents which she stated she had researched on line that showed Stapley had filed false and/or incomplete disclosure statements. Some of the documents that Aubuchon handed out showed that they had been printed from the Internet in January or February 2007. The fact that Thomas told Stribling that Aubuchon had already done research on the internet, and the fact that she gave out documents that were printed out in January and February 2007, shows that she had commenced an investigation of Stapley as early as January 2007, or that she knew an investigation had been commenced by then.

At the May 14, 2008 meeting, Aubuchon also handed out a draft indictment which set forth 79 counts. This draft indictment includes allegations of misconduct by Stapley beginning in 1994. In order to prepare this indictment, investigation of Stapley had to commence before May 14, 2008.

1    Sgt. Luth asked Aubuchon at the May 14, 2008 meeting if her handing out all
2  the information made her a witness in the matter.  According to Luth, she responded,
3  "That's why we are going to have you guys [MCSO] do it."  Lieutenant Travis Anglin of
4  MCSO remembers such a meeting and remembers he was concerned about the
5  statute of limitations issue.  He asked Aubuchon about that issue and she assured
6  him it was okay.  She also told him to use that date (probably May 14, 2008) as the
7  date for the MCSO report.
8
        The only Sheriff's Departmental Report that has been discovered about the
9  *Stapley I* matter is dated May 14, 2008.  That report does not indicate why the
10 investigation was commenced or what research or investigation had been done before
11 that date.
12
        There is additional evidence regarding the timing of the *Stapley I* investigation.
13 In June 2007, a notebook of information was given either to Bruce Tucker and/or
14 Travis Anglin of MCSO.  This notebook or a memo in it had a sticky note attached
15 saying that it was "rec'd Weds. June 20, 2007 @ 1600 from Sally Wells."  Ms. Wells
16 was third in charge of MCAO behind Thomas and Phil MacDonnell.  She attended
17 weekly meetings of MACE in 2007.  The information in the notebook includes a memo
18 with the following heading:  "Yavapai County Matters; Issues Related to MCSO
19 Investigation of Donald Stapley."  Section IV of the memo is headed "Filing Financial
20 Disclosure Statements with False or Misleading Information."  Under that section
21 various criminal statutes are noted including forgery, theft and A.R.S. §§ 38-504, 38-
22 543 and 38-544.  The memo and the information in this notebook indicate that
23 Stapley's financial disclosures were under investigation earlier than June 20, 2007.
24
25

1    There is also evidence that Stapley was discussed at MACE (Maricopa County

2 Anti-Corruption Effort[25]) meetings in May and June 2007.  Deputy County Attorney

3 Vicki Kratovil went to MACE meetings from December 2006 through about June

4 2007.  She kept a notebook containing among other things the agenda for meetings.

5 These agendas were written by Bruce Tucker, formerly of MCSO.  Stapley is listed on

6 the agenda for MACE meetings occurring May 9, May 23, June 6, June 13, June 20,

7 and June 27, 2007.  After his name it is noted in parentheses that these matters are

8 being referred to Yavapai County.  (This is not the same referral that was done later

9 in April 2009.)  This notation is consistent with the memo in the notebook that was

10 described in the paragraph immediately above.  The meeting agenda for June 13,

11 2007, states that a public records request was to be drafted with the assistance of

12

13 "Deputy Maricopa County Attorney Mark Goldman."

14    The indictment of Stapley charges misdemeanor violations of A.R.S §38-542

15 and §38-544, Failure to File and/or filing False or Incomplete Financial Disclosures.

16 As noted above the evidence establishes that the investigation began in January

17 2007, but no later than early June 2007.  Therefore, the State had to commence

18 prosecution of Stapley by June 2008 on 44 of the misdemeanors charged in the

19 indictment.[26]  However, Stapley was indicted on November 20, 2008.  The statute of

20 limitations had run on those charges.

21

22

23

24 [25] MACE was a joint task force between MCSO and MCAO that started in about December 2006.
[26] There were 9 misdemeanor charges regarding conduct of Stapley that allegedly occurred in January
25 2008.  The state brought those charges within one year of the conduct and therefore within the statute of
limitations.

### 6. Ethical Violation #9
### (Aubuchon and Thomas) Conduct Prejudicial to the Administration of Justice

Aubuchon and Thomas charged Supervisor Stapley with 44 misdemeanors when the Arizona statute of limitations barred those charges.  The State, through Yavapai County Attorney, Sheila Polk has conceded that the statute of limitations barred those charges.[27]  The statute of limitations is triggered when the state actually discovers, or through exercise of reasonable diligence should have discovered that there was probable cause to believe that the offense was committed.  As noted above, Aubuchon and MCSO began the investigation of Stapley probably in January 2007, but no later than June 2007.

In Arizona the court lacks jurisdiction to consider crimes against a person on which the statute of limitations has run.  *State v. Fogel*, 492 P.2d 742, 744 (Ariz. App. 1972).  In that case the court stated the following:

> Unlike a statue of limitations in a civil case, a criminal statute of limitation is not a mere limitation on the remedy, but a limitation upon the power of the sovereign to act against the accused.  It is jurisdictional (citations omitted).

Aubuchon and Thomas knew that most of the misdemeanor charges they brought against Stapley were commenced outside the statue of limitations.  Their conduct violated ER 8.4(d) because it was prejudicial to the administration of justice to obtain an indictment knowing that the court did not have jurisdiction over Stapley for those 44 alleged violations.  Furthermore, Aubuchon never presented information to the grand jury which returned the indictment that the statute of limitations had

---

[27] *See* Appellant's Reply Brief, fn. 1, *State v. Stapley*, Arizona Court of Appeals, 1 CA-CR 09-0682, May 3, 2010.