run.  Aubuchon did not elicit any testimony from the one witness who testified in front of the grand jury about the time frame of the investigation or who began it. This is further evidence of conduct prejudicial to the administration of justice in violation of ER 8.4(d).

### 7.    Ethical Violation #10<br>(Aubuchon) Dishonesty

ER 8.4(c) prohibits an attorney from engaging in conduct involving dishonesty, misrepresentation, fraud or deceit.  Aubuchon engaged in dishonesty by failing to tell the grand jury that many of the misdemeanor charges were barred by the statute of limitations.  There is significant circumstantial evidence that she knew those charges were outside the statute.  Because the statute of limitations is a jurisdictional matter in Arizona, if a prosecutor knows that charges are barred, then she must inform the grand jury and should advise the grand jury not to indict on charges arising from conduct outside the statute.  Instead, Aubuchon presented an indictment listing all of the charges including 44 barred by the statute.  Aubuchon's failure to tell the grand jury about the State's lack of jurisdiction to act against Stapley on those charges was dishonest.

**Transfer of the Stapley Case to Sheila Polk.**  In March or early April 2009, Thomas transferred *Stapley I* to the Yavapai County Attorney, Sheila Polk.  At this time Stapley's motion for determination of counsel was still pending in front of Judge Fields.

In addition to the challenge to MCAO's ability to act as counsel for the State in the Stapley case, a bar complaint had been filed against Thomas alleging a conflict of interest in that case.  *See* Bar Complaint 08-2289.  The State Bar is named as the complainant and the matter was filed in December 2008.  That bar complaint was transferred and assigned to retired Superior Court Judge Rebecca Albrecht to handle as independent bar counsel.  Judge Albrecht dismissed the matter on May 4, 2009, on the condition that Thomas withdraw from the case and transfer it to Yavapai County.  She stated in her letter, however, that the issues were highly concerning and should similar conflict of interest concerns come up in the future, the file could be reviewed anew.

On April 2, 2009, the Yavapai County Attorney, Sheila Polk, agreed with Thomas to take over the prosecution of *Stapley I.*  She also agreed that she would handle pending investigations regarding members of the board of supervisors including allegations against Supervisor Wilcox and an investigation of the court tower project.

On April 6, 2009, Thomas wrote to Supervisor Max Wilson and stated at the top that it was "An Open Letter to the People of Maricopa County."  He stated that he referred the *Stapley* case to Polk and that he was also transferring to her the completion of the investigation related to the Maricopa County Superior Court Tower as well as current or future investigations or prosecutions involving the MCBOS or county management.  Also on April 6, 2006, Thomas issued a News Release captioned, "County Attorney Offers Compromise to End Infighting, Sends Stapley case, Investigations to Yavapai County; Proposes Mediation."

Ms. Polk entered her appearance on April 15, 2009 and asked former Navajo County Attorney Melvin Bowers to serve as the prosecutor in the case.

Although all of these matters, including *Stapley*, were transferred to Polk, Aubuchon still advised the Maricopa County Sheriff about them.  The evidence of her continued involvement is her statement at a meeting in September 2009 with Polk, and Polk's assistant Dennis McGrane.  When Polk stated that there was more to do on the investigation of Supervisor Wilcox, Aubuchon said that she had advised the sheriff's office of that need.

Aubuchon responded to Independent Bar Counsel stating that she was not aware of the Albrecht letter, she was not a party to it, and it did not pertain to her. She has not disclosed when she became aware of the Albrecht letter.  She has not denied, however, knowing that Thomas had transferred the matter to Polk while allegations of a conflicts of interests were pending against Thomas and her office. Further, she has not denied that, notwithstanding the transfer to Polk, she stayed involved in the Stapley matter.

***Thomas' Public Statement About the Dismissal of Stapley I.***  Attorneys for Mr. Stapley filed motions to dismiss the criminal charges against him based upon grounds other than MCAO's conflicts of interest.   First, they asked the court to dismiss the case for vagueness.  They also filed a motion to dismiss based upon the county's failure to follow the requirements of A.R.S. § 38-545 to promulgate standards for financial disclosure.  On August 24, 2009, Judge Fields denied the vagueness motion, but granted the second motion in part and dismissed many counts.  Thomas issued a public statement on the same day as Judge Fields's ruling.

Although Polk was the prosecutor for the State on that day, Thomas nevertheless issued this press release.  In his public statement he urged Ms. Polk to appeal the ruling.  Thomas further stated the following:

> It is unjust and improper for this criminal defendant to be able to claim that as a member of the board of supervisors, he failed to properly pass or amend the very laws he's accused of violating. For him to be able to take advantage of the improper performance of his own public duties is wrong by any measure.  It's equally wrong that the people of Maricopa County have just been told they're the only citizens of Arizona whose elected county officials don't have to disclose their private business dealings to the voters.

> The ruling today reinforces our office's concerns about the impartiality of Judge Fields.  He was handpicked for this case in violation of the rules of court, despite his having filed a bar complaint against the Maricopa County Attorney (which was dismissed) and having campaigned for Mr. Thomas' opponent in last year's election.  Four esteemed experts in judicial ethics have stated that Judge Fields was ethically required to recuse himself from this case.

## 8.    Ethical Violation #11
### (Thomas) Improper Public Statements

Thomas violated ER 3.6(a) in making the above statement when Judge Fields dismissed some of the counts against Stapley.  ER 3.6(a) applies to a lawyer who is participating or has participated in the investigation or litigation of a matter.  Thomas had participated in both the investigation and litigation of the *Stapley I* case. Thomas made an extrajudicial statement that he knew or reasonably should have known would be disseminated by means of public communication and that would have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

### E.   Occurrences at about the Time of Stapley Indictment and Thereafter.

In December 2009, Thomas, Aubuchon and Alexander committed multiple ethical violations by retaliating against members of the Board, judges and attorneys who were involved in disputes with Thomas.

The following outline summarizes the disputes that occurred primarily during 2009 that led to further retaliation by Thomas, Aubuchon and Alexander against Supervisor Mary Rose Wilcox, Supervisor Don Stapley, Superior Court Judge Gary Donahoe, and against all of the defendants in the RICO case discussed below.

***The Court Tower Investigation.***   In late 2008, Thomas and the Maricopa County Sheriff began to question the decision to build the new court tower, a decision in which they had no official role.   They began to investigate the Court Tower, and their decision to do so was personally and politically motivated.

According to Eric Dowell, who has acted as an attorney for Thomas, in late 2008 and early 2009 MCSO and others expressed concern about the County's decision to cut jobs without making any cuts to the $347 million Court tower project. Mr. Dowell stated that, accordingly, MCAO and MCSO launched a criminal investigation into the Court Tower.[28]

Chief Hendershott testified in front of a grand jury in January 2010 that there was concern at a MACE unit meeting that the Court Tower should not be built.[29]

---

[28] Dowell Letter to State Bar, April 1, 2010, Bar Complaint against Novak and Irvine, p. 3, Statement of Information.
[29] January 4, 2010, GJ transcript, p. 44.

1  There also was some concern that attorney Thomas Irvine was being paid as a space

2  planner on the Court Tower.

3      In Aubuchon's words, the Court Tower investigation was initiated because it

4  was not clear why the Board would still be going forward with the project in the face

5  of an economic downturn.[30]   Ms. Aubuchon stated to Supervisor Kunasek in

6  February 2010 that it was "basically a little odd" that the Board slashed county

7  budgets, laid people off and went forward with a three hundred and fifty million

8  dollar project that was not really needed.[31]   Aubuchon expressed concern about the

9  hiring of Mr. Irvine to assist with the court project. [32]

10     As noted in a Maricopa County Sheriff's Office (MCSO) Departmental Report

11 ("DR") in the case against Judge Donahoe (Sheriff's Office Supplemental Report - DR#

12 09-225204), officials of both the sheriff's office and MCAO perceived that the Board

13 began "to act against the County Attorney" after the *Stapley I* indictment was served

14 or filed.  The DR states that "they," meaning the Board, hired attorney Tom Irvine to

15 "block investigations and prosecutions directed toward them (Board Members)."

16     Sgt. Luth of the MCSO stated that he did not know who the complainant was

17 on the Court Tower investigation.  He stated that he asked Lisa Aubuchon where the

18 complaint came from and she stated, "it was your guys' case."

19     Independent Bar Counsel found no evidence justifying the initiation of the

20 Court Tower investigation.   Independent Bar Counsel also discovered no evidence of

21 the slightest amount of criminal conduct by the Board, counsel for the Board, judges

---

[30] Transcript of taped discussion between Kunasek, his attorney, and Aubuchon date February 10, 2010.
[31] *Id.*
[32] *Id.*, p. 3

37

1  or County employees.  The evidence suggests that the motivation for initiating this

2  investigation was personal animosity by Thomas, Aubuchon and the sheriff against

3  the Board, county officials and attorney Thomas Irvine.

4  **_Ruling by Donahoe Re: GJ Subpoena_**.  On February 6, 2009, Judge Gary

5  Donahoe ruled in the Court Tower Grand Jury Case (Case No. 462 GJ 350).  Judge

6  Donahoe's ruling covered three pending motions: 1) MCBOS's motion to quash the

7  subpoena duces tecum on the County; 2) Thomas and Aubuchon's motion to

8  disqualify Irvine's firm; and 3) Thomas and Aubuchon's motion to assign an out-of-

9  county judge to rule on the motion to quash and the motion to disqualify.  Judge

10  Donahoe denied the motion to appoint an out of county judge, stating that he had no

11  interest in the court tower project.  Judge Donahoe disqualified MCAO.  He stated

12  that the issue was the ethical propriety of the Board's attorney (Thomas) seeking

13  documents from his client (MCBOS) as a part of a grand jury investigation.  He found

14  that MCAO was counsel for the Board and gave the Board legal advice regarding the

15  court tower, and therefore they had a conflict of interest that disqualified MCAO from

16  conducting an investigation of its client on the very topic on which it gave legal advice

17  to its client.   Judge Donahoe also denied Thomas and Aubuchon's motion to

18  disqualify Irvine's firm.

19  Thomas and Aubuchon filed a special action requesting review of Donahoe's

20  rulings in the court of appeals, CA-SA 09-0056, and then in the Supreme Court, CV

21  09-0165 PR.  The Court of Appeals declined to take jurisdiction in May 2009.  The

22  Supreme Court declined to review it on December 1, 2009.  Neither Thomas nor

23  Aubuchon appealed the ruling.  Judge Donahoe's ruling stands.

1    ***Hiring Irvine regarding Thomas Conflicts.***   On about December 5, 2008,

2    four county supervisors (Stapley recused himself) met and decided to hire attorney

3    Tom Irvine to review Thomas' conflicts in representing the Board.   It was generally

4    known that Irvine had been hired by the Maricopa County Superior Court to assist

5    with the court tower project.   He had openly attended and noted his attendance in

6    writing to various meetings about the Court Tower project as working for the court.

7    Irvine's providing counsel  to the courts became an issue later when Deputy County

8    Attorney, Elizabeth Ortiz, filed a pleading on behalf of MCAO claiming that it was

9    "newly discovered" that Mr. Irvine worked for the courts.   *See Thomas v. Donahoe,*

10   Amended Petition for Review, Supreme Court CV 09-0165 PR.   This pleading did not

11   contain Lisa Aubuchon's signature, but she is identified on the cover page as one of

12   the lawyers representing the County Attorney.

13

14   ***MCBOS Acts to Manage Civil Litigation.***   On about December 23, 2008, the

15   Board voted to manage all of the civil legal actions in which the County was a party.

16   MCBOS delegated to County Manager David Smith the implementation of that action.

17   Eventually a civil litigation department separate from the county attorney's office was

18   established with Wade Swanson, Esq., as the director.   (Both Mr. Smith and Mr.

19   Swanson were also later named as defendants in the RICO action.)

20

21   ***Declaratory Judgment Action.***   On December 31, 2008, Thomas and the

22   sheriff sued the Board over their authority to hire lawyers.   *Thomas and Arpaio v.*

23   *MCBOS,* CV2008-033194 (commonly referred to as "the Dec Action," short for

24   declaratory judgment action.)   Thomas Irvine represented the Board in the suit.

25   MCAO was represented by three named lawyers at Ogletree, Deakins, Nash, Smoak &

1   Stewart, including Eric Dowell.   (Mr. Dowell represented Mr. Thomas in the bar

2   investigations of Mr. Thomas until recently.)

3        The complaint in the Dec Action asked for, among other things, an order that

4   the Board could not hire Mr. Irvine, or any other counsel to advise it about Thomas's

5   conflicts; that the Board could not choose its own counsel if there was conflict in

6   Thomas's representation of the Board; and that only the county attorney, not the

7   Board, could determine if *he* had a conflict of interest.

8        The Board, through Mr. Irvine, filed an Answer and a Counterclaim on April 6,

9   2009.  The Board asked the court to declare that Thomas's conflicts made him

10  unavailable to act as the Board's attorney, and to declare that the Board could

11  choose its own counsel because the county attorney was unavailable due to his

12  conflicts.

13

14       Judge Daughton ruled against Thomas in this case and in favor of the Board as

15  discussed below.

16       ***Quo  Warranto  Action***.   In  December  2008  Thomas  sued  Tom  Irvine

17  individually at the same time he sued MCBOS.  *Thomas v. Irvine, Shughart Thomson*

18  *& Kilroy and Richard Romley*, CV2008-033193.  This action claimed that Irvine had

19  usurped the authority of the County Attorney.  No answer was filed, and the case was

20  voluntarily dismissed on December 7, 2009.  The parties agreed that this action

21  would be determined by the outcome of the Dec Action, and for that reason there was

22  no substantive litigation of this matter.

23

24       In addition to suing Irvine and the County over the hiring of Irvine, Thomas

25  sent letters to the county employees threatening them with criminal prosecution if

1  they paid any money to Irvine or his firm.  In a letter to Supervisor Kunasek, dated

2  December 5, 2008, Thomas, through Deputy Philip MacDonnell, urged him to consult

3  about this issue with the Civil Division of the County Attorney, and that if the Board

4  hired Mr. Irvine's firm the Board would be performing an illegal act and subject the

5  Board to actions for recovery of money paid.  In a letter to County Manager Smith,

6  Deputy Manager Wilson, and chief Financial Officer Manos, Thomas demanded that

7  they issue no warrants for outside counsel and stated that the Board's action taken

8  on December 5, 2008 was unlawful.  If any moneys were paid to Mr. Irvine's firm,

9  Thomas threatened legal action to recover funds from them personally.

10

11  **"*Sweeps*" Lawsuit.**   On February 27, 2009, Arpaio and Thomas sued the

12  Board in a new action about funds that had been appropriated or encumbered by the

13  supervisors.  *Arpaio and Thomas v. MCBOS*, CV2009-006709 (referred to as "the

14  Sweeps" case).  The case arose out of the State's decision to withhold funds from each

15  county entity because of a budgetary crisis.   Both Arpaio and Thomas were

16  represented by Eric Dowell's firm.   Irvine represented MCBOS.   In part the

17  defendants alleged that Thomas should be precluded from bringing this suit because

18  it essentially equated to a lawyer suing his own client for an act that he had

19  previously approved.   Judge Klein did not rule on this issue in his order, but he

20  granted summary judgment for the county on June 10, 2009, finding that Thomas

21  and Arpaio had no standing.  This matter is on appeal and oral argument occurred in

22  May 2010.

23

24  **Ruling by Daughton regarding Declaratory Judgment Action.**  On Aug. 27,

25  2009, Judge Daughton ruled on motions filed in the Dec Action.  He found that the

1  County Attorney 1) was subject to the Rules of Professional Conduct; 2) that he had

2  not complied with his professional obligations concerning client conflicts; 3) that

3  Thomas is not the one to decide if there is a conflict; and 4) MCBOS actions on

4  December 5 and 23, 2008, were appropriate.  The court entered judgment against

5  MCAO.  This matter was appealed to the court of appeals by route of Special Action,

6  Case No. CA-SA 09-0212.  On October 27, 2010, the Court of Appeals issued its

7  opinion in this matter.  In summary the opinion upholds Judge Daughton's ruling

8  but remands it to the trial court to determine conflicts of interest on a case-by-case

9  basis.

10

11  **_Thomas Takes Stapley II and Other Cases Back From Polk_**.  In September

12  2009, under pressure from Sheriff Arpaio, Thomas took back control of _Stapley II_,[33]

13  the investigation of Supervisor Wilcox, what is known as the court tower investigation

14  and the "bug sweep" investigation against county officials from Yavapai County

15  Attorney Sheila Polk.  Thomas did so because he was pressured by the Sheriff who

16  thought that Ms. Polk was not cooperative in issuing subpoenas that were desired by

17  Sheriff's investigators.

18  Thomas never informed the State Bar or Judge Albrecht that he was doing so.

19  Judge Albrecht had dismissed the Bar complaint against Thomas because Thomas

20  represented that he had withdrawn from the matter.  Even if Thomas did not agree

21  with Judge Albrecht's handling of the investigation, or her statement that his conduct

22

23

24

25  [33] _Stapley II_ refers to a second criminal investigation and the subsequent case filed against Donald
Stapely in December 2009, CR2009-007891.

1  raised serious concerns, he should have informed her or the bar that he was taking

2  these investigations back.

3      ***Thomas's Efforts to Appoint Special Prosecutors.***  After taking the cases

4  back Thomas wanted to appoint two lawyers from Washington, D.C. to investigate the

5  court tower matters and to handle *Stapley I.*  This led to another fight with the

6  MCBOS because they would not approve his choice for outside counsel.

     **1.**    **Ethical Violation #12**
              **(Thomas) Using Means with no Substantial Purpose other than**
              **to Embarrass, Delay or Burden**

10     Thomas violated ER 4.4(a) by sending letters to Supervisor Kunasek and other

11  county employees threatening them that the payment to Mr. Irvine's firm would be

12  unlawful and would subject them to action recover the funds from them personally.

13  The sole purpose of Thomas' threats was to intimidate and to burden county

14  employees and Mr. Irvine.

15

16     **2.**    **Ethical Violation #13**
              **(Thomas and Aubuchon) Issuing Grand Jury Subpoena and**

17                **FOIA Request to Burden County**

18     The grand jury subpoena that Aubuchon and Thomas issued in December

19  2008 was broad and overreaching.  The subpoena was directed to "Maricopa County

20  Administration" and was to the attention of David Smith, County Manager.  It

21  required the production of budgets; records about funding; documents regarding

22  proposed usage, occupancy, RFP's, contracts re: planning and design; contracts re:

23  construction; contracts re: consultants; and any and all documents, correspondence

24  and email referring to the Court Tower project.  Aubuchon signed the subpoena.  The

purported justification for this subpoena was that, as noted above, the Board was going forward with the Court Tower project while in an economic downturn, and Treasurer of the County, Hoskins, was unable to get information from the MCBOS about how the money was being spent on the court tower; and general concern that attorney Irvine was being paid too much money.

In addition to the grand jury subpoena, Thomas also issued FOIA requests to the county. He was in essence making FOIA requests to his own client. The FOIA requests were broad and burdensome.

Thomas and Aubuchon violated ER 4.4(a) in issuing the grand jury subpoena and the FOIA requests. Considering the totality of the circumstances, including the overbroad scope of the requests and the political motivations behind them, Thomas's FOIA requests had no substantial purpose other than to burden the county and its employees.

### 3. Ethical Violation #14 (Thomas and Aubuchon) Conflicts of Interest in Court Tower Investigation

Thomas and Aubuchon violated ER 1.7(a)(1) in investigating the court tower matter. They were representing the State as prosecutors and investigating their client, the Board of Supervisors. As found by Judge Donahoe, they were investigating a matter about which MCAO had advised the Board. They represented one client against another, which is a concurrent conflict of interest.

Additionally, Thomas and Aubuchon violated ER 1.7(a)(2) by initiating and conducting the court tower investigation. Their representation of the State of Arizona

as prosecutors was limited by their own personal interests. They were motivated to investigate the court tower because of their personal disagreement and hostility toward the Board and others including Thomas Irvine.

This conflict of interest led to Thomas issuing needless FOIA requests to the County through county attorney employee Mike Scerbo (not a licensed lawyer). The Sheriff had also made FOIA requests. These FOIA requests were sweeping and cost the county hundreds of thousands of dollars in order to comply.

### F. The RICO Case.

On December 1, 2009, Thomas and Aubuchon filed a federal civil RICO action against various defendants.[34]   The purported plaintiffs in this action were Thomas and Sheriff Joe Arpaio. Lisa Aubuchon signed the complaint. The signature block appears as:

> ANDREW P. THOMAS
> MARICOPA COUNTY ATTORNEY
>
> By: s/Lisa M. Aubuchon
> Lisa M. Aubuchon
> Deputy County Attorney

Thomas appears as both a plaintiff and the lawyer for plaintiffs in this civil case.

The RICO complaint named the following defendants:

- Maricopa Board of Supervisors, a body politic and corporate;
- Fulton Brock, Supervisor;
- Andrew Kunasek, Supervisor;

---

[34] The day before this complaint was filed, Judge Gary Donahoe set a hearing to occur on December 9, 2009. The hearing would consider a motion to remove MCAO from handling criminal investigations of county employees.

- Donald T. Stapley, Supervisor;
- Mary Rose Wilcox, Supervisor;
- Max Wilson, Supervisor;
- David Smith, County Manager;
- Sandi Wilson, Deputy County Manager;
- Wade Swanson, Office of General Litigation;
- Judge Barbara Mundell, Superior Court;
- Judge Anna Baca, Superior Court;
- Judge Gary Donahoe, Superior Court;
- Judge Kenneth Fields, Superior Court;
- Thomas Irvine, attorney;
- Edward Novak, attorney.

The complaint itself is confusing, difficult to analyze, and does not set out the elements of a RICO civil action. The complaint is deficient because at a minimum it fails to define an enterprise, fails to identify the racketeering activity, and fails to allege proper injury or damages.

The federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.*, was passed in order to address the infiltration of legitimate businesses by organized crime. *U.S. v. Turkette*, 425 U.S. 576, 591 (1981). One provision of RICO establishes a civil cause of action. The purpose of a civil RICO action is not merely to compensate victims but to turn them into private attorneys general dedicated to eliminating racketeering activity. *Rotella v. Wood*, 528 U.S. 549, 557 (2000). The statute provides that any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 shall recover threefold the damages he sustains and the costs of the suit. 18 U.S.C. § 1964(c). One seeking to recover under the civil remedy must show that a violation of 18 U.S.C. § 1962 occurred. Simply stated that provision prohibits: 1) using funds obtained through racketeering to establish an enterprise; 2) acquiring an interest or control of an enterprise through

1  a pattern of racketeering activity; 3) conducting an enterprise's affairs through a

2  pattern of racketeering activity; and 4) conspiring to do the above activities.

3      To establish liability under a civil RICO claim, one must show that a defendant

4  was involved in (1) conduct (2) of an enterprise (3) through a pattern (4) of

5  racketeering activity.  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir.

6  2004).

7      The complaint filed by Thomas and Aubuchon does not establish what the

8  "enterprise" was.  Under RICO there are two categories of associations that come

9  within the purview of the "enterprise" definition. The first encompasses organizations

10  such as corporations, partnerships and other "legal entities." The second covers "any

11  union or group of individuals associated in fact although not a legal entity."  *U.S. v.*

12  *Turkette*, 542 U.S. at 581-2.   In paragraph 78 of the complaint Thomas and

13  Aubuchon concluded that all of the defendants were engaged in an enterprise, as

14  they were all related by contract, or they were a legal entity or a group associated in

15  fact.  In the same paragraph they state that "these enterprises" engaged in activities

16  which affected interstate commerce.  However, there are no specific allegations in the

17  complaint as to what the enterprise was and what its structure was.[35]  There is no

18  evidence that the defendants were in an "enterprise" as defined by RICO.

19      Although Thomas and Aubuchon mentioned bribery and extortion in various

20  places in the RICO complaint, they did not specifically allege any conduct of a specific

---

[35] "In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise." *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1981).

1 defendant or enterprise constituting bribery or extortion.[36]  Racketeering activity can

2 be bribery and extortion under state law if punishable by imprisonment for more

3 than one year.   18 U.S.C. § 1961(1).   However, there must be a pattern of such

4 activity.   The complaint fails to set forth any factual basis that establishes

5 racketeering activity as contemplated by the RICO statute.

6     A plaintiff in a RICO action can only recover damages to his business or

7 property by reason of the conduct of an enterprise through a pattern of racketeering

8 activity.   18 U.S.C. § 1964(c).   Thomas and Aubuchon alleged that some of the

9 defendants had instigated frivolous investigations of Thomas and MCAO prosecutors

10 with the State Bar of Arizona, or had threatened to go to the State Bar about

11 Thomas.[37]  MCAO deputy county attorney Rachel Alexander continued to make this

12 assertion in a response she filed to motions to dismiss.  She argued that part of the

13 injury to Thomas was that the defendants attempted to deprive him of his license to

14

15 practice law.[38]   In asserting these claims Thomas, Aubuchon and Alexander

16 disregarded Rule 48(l) of the Arizona Supreme Court which states that anyone who

17 complains to the State Bar about an attorney is immune from civil suit.

18     There is no evidence that an investigation was conducted into the facts alleged

19 in the complaint and no MCAO file has been produced to establish otherwise.

20 Aubuchon has admitted as much to attorney Kate Baker who conducted an

21

22 investigation into Aubuchon's conduct.[39]   Rather, the inference to be drawn from the

23

[36] RICO Complaint, ¶¶ 1, 34, 70, 79 and 81.
24 [37] RICO Complaint, ¶¶ 31, 39, 58, 64, 70 and 76.
[38] Plaintiffs' Response to Defendants' Motions to Dismiss, pp 29-31.
25 [39] Baker, Report of Personnel Investigation Re: Deputy County Attorney Lisa Aubuchon, p. 64. (Hereinafter referred to as "Baker Report.")

lack of a file and the lack of an investigation is that Aubuchon and Thomas drafted the RICO complaint based not on facts but on their personal animosity toward all the defendants.

Many of the defendants filed motions to dismiss the RICO case. Alexander filed a frivolous response to these motions and, as noted above, her response continued the suit needlessly and without justification. Alexander's response was not based on any facts. She did not obtain any facts or any investigative file on which to base her argument that the complaint should not be dismissed. Alexander had been warned by another Deputy County Attorney, Peter Spaw, that she needed to obtain the investigation file for the matter so that she could determine what the facts were. Unknown to Mr. Spaw at that time, there was no such file. Alexander's efforts to maintain the RICO case were meritless and frivolous.

Alexander also filed a First Amended Complaint in the RICO action. This version attempted to define the enterprise as the Board. After the defendants objected the court did not allow the First Amended Complaint.

Significant evidence shows that other lawyers in the MCAO did not think that the RICO case had any factual basis or merit. Thomas, Aubuchon and Alexander were all aware of at least one other lawyer's views that the RICO case lacked merit. Deputy County Attorney Spaw was asked to work on the RICO case both before and after it was filed. Most of his involvement was after the case was filed. He advised both Thomas and Aubuchon that the case lacked merit.

The RICO action was voluntarily dismissed in March 2010. At the same time Thomas and Arpaio announced that they were turning the matter over to the Public

Integrity Section of the U.S. Department of Justice. It appears that they actually referred nine "investigations." Those matters were all transferred to the U.S. Attorney's Office for Arizona. On October 22, 2010, Dennis Burke the United States Attorney for Arizona wrote to County Attorney Romley stating that there was a total lacking of any evidence that a federal crime was committed. He stated that in several instances the evidence was so lacking as to make a theory of liability nearly incomprehensible.

In the RICO action the evidence indicates that Thomas, Aubuchon and Alexander were abusing their power and authority as county officers.[40] They filed the RICO case in retaliation against the defendants not based upon their criminal activity as alleged but based upon the defendants' exercise of lawful authority that frustrated and infuriated Thomas, Aubuchon and the sheriff.

**1. Ethical Violation #15**
**(Thomas, Aubuchon and Alexander) Using Means That**
**Have No Other Purpose than To Burden or Embarrass A Person**

ER 4.4(a) states that in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person. The purpose of the RICO case was to burden and/or embarrass the defendants. No factual or legal basis supported the filing of the RICO case. The motive for filing the RICO action was retaliation against those who had acted against Thomas and MCAO. In filing and pursuing the RICO case, Thomas, Aubuchon and Alexander each violated ER 4.4(a).

---

[40] Paragraph 1 of the RICO complaint states in part: "This action arises from a concerted scheme to hinder the criminal investigation and prosecution of elected officials and employees of Maricopa County, Arizona and their attorneys in the course of committing the predicate offenses described herein related to the finding and construction of the Maricopa County Superior Court Tower."

### 2.   Ethical Violation #16
### (Thomas, Aubuchon and Alexander) Filing a Frivolous Suit

The RICO case was meritless and frivolous.  There were no facts and no law that supported the case for the following reasons:

- Neither of the plaintiffs had standing to bring the action

- There was no good faith basis in fact for the action

- There was no good faith basis in law for the action

- There was no statutory authority for Thomas to sue under the RICO statute for himself or for Arpaio

- Most of the defendants including the named judges and county officials were immune from such an action.

ER 3.1 states that a lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a good faith basis in law and fact for doing so that is not frivolous which may include a good faith and non-frivolous argument for an extension, modification of reversal of existing law.  Thomas and Aubuchon brought the RICO case, and Alexander defended it.  In doing so each of them violated ER 3.1.

Arizona statutes do not empower a county attorney to bring an action such as the RICO case.  The complaint states that it is brought in the name of Thomas and Arpaio in their official capacities as County Attorney and as County Sheriff respectively.  Among the defendants is the county Board "as a body politic." One of the requests for relief asks the federal court to award treble damages against all defendants, and specifically damages to make Arpaio whole from the harm he had he had allegedly suffered.  A.R.S. §11-535 prohibits a county attorney from presenting a

51

demand for allowance against the county or advocating the demand for an allocation of another.  Therefore, Thomas, Aubuchon and Alexander could not bring this action against the Board.  The suit was meritless on these grounds as well.

### 3.      Ethical Violation #17
### (Thomas, Aubuchon and Alexander) Competence

ER 1.1 states that a lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.  Thomas, Aubuchon and Alexander each failed to provide competent representation in the RICO action.  The complaint that Thomas and Aubuchon filed was legally deficient.  Further, there were no facts that supported the RICO complaint.  Alexander's attempts to prolong and continue the case were based upon incompetent reasoning.  She accepted the conclusions based upon "facts" alleged in the complaint filed by Thomas and Aubuchon without question.

At the end of the response to the motions to dismiss Alexander wrote the following:

> As a final alternative, and in the event plaintiffs cannot proceed at all with this Complaint, plaintiffs seek guidance from this Court as to how federal law may be changed to permit local law-enforcement officials to challenge the complained-of conduct in federal court, so that plaintiffs may petition Congress to amend federal law accordingly.[41]

Alexander's plea for guidance from the U.S. District Court about how to change federal law to allow a challenge to the "complained-of" conduct is a telling admission

---

[41] *Id.* at p. 45.

that she, Thomas and Aubuchon were fundamentally incompetent in bringing the RICO action.

Alexander's continued efforts to argue that Thomas could sue the RICO defendants because they had allegedly filed Bar complaints against him were incompetent.[42]  She also argued that judicial immunity did not apply to the judges being sued because they had committed acts outside the scope of their judicial duties.[43]  Her argument was that the judges had issued rulings that ignored the law.[44]  Alexander's arguments in response to the motions to dismiss were incompetent as was the original complaint.

### 4.    Ethical Violation #18
### (Thomas, Aubuchon and Alexander) Conflicts of Interest

Thomas, Aubuchon and Alexander represented the State of Arizona in bringing the RICO action against the Board of Supervisors, as a body, each of the individual supervisors, the county manager and his deputy.[45]  However, they were all also purportedly representing Thomas and Arpaio.[46]  In so doing, Thomas, Aubuchon and Alexander were suing various clients on behalf of at least one other purported client,

---

[42] Plaintiffs' Response to Motions to Dismiss, p. 29 *et seq.*, filed 2/01/10 in RICO case.

[43] *Id.,* at p.43 *et seq.*

[44] *Id.*

[45] Aubuchon stated in a Response to Petition for Special Action, CV 09-00372 SA, that the County Attorney, in his official capacity as a county law-enforcement officer, filed the RICO suit against the defendants based in part on criminal conduct. She also stated that the County Attorney requested no personal damages in the RICO case and sought relief only so he could effectively combat the corruption that is being shielded from proper prosecution in the county court system. Response, pp. 11, 14.

[46] On February 16, 2010, attorneys Elizabeth Fierman and Robert Driscoll substituted in to represent the Sheriff Arpaio in the RICO action.

1 | Arpaio.   In doing so, Thomas, Aubuchon and Alexander violated ER 1.7(a)(1); they
2 | represented clients who were directly adverse to other clients.
3 |   In bringing and pursuing the RICO action against supervisors, judges and
4 | attorneys, Thomas's, Aubuchon's and Alexander's representation of their client or
5 | clients was limited by their own personal interests in violation of ER 1.7(a)(2).  By the
6 | time the RICO complaint was filed in early December 2009, Thomas and Aubuchon
7 | had been involved in many disputes with the defendants they sued in the RICO
8 | action.   Judges who were defendants in the RICO action had ruled against Thomas
9 | and his office.   Supervisors had exercised their lawful authority contrary to the
10 | personal and professional wishes of Thomas and his office.   Each of these disputes
11 | was resolved unfavorably to Thomas.   Among the disputes and rulings were:
12 |

- Thomas' and Aubuchon's unsuccessful attempts to depose or interview Judge Mundell and Judge Baca about the appointment of Judge Fields to the *Stapley I* case.

- Thomas' and Aubuchon's unsuccessful attempts to remove Judge Fields from the *Stapley I* case.

- MCBOS (less Stapley) hired attorney Irvine to determine if Thomas had conflicts of interest.

- MCBOS determined to manage all the county's civil litigation through county manager Smith.

- Thomas sued MCBOS in the "Dec Action."

- Judge Donahoe quashed the court tower grand jury subpoena, and disqualified MCAO from that investigation.

- Judge Daughton ruled against Thomas in the "Dec Action."

- Thomas sued attorney Tom Irvine in the Quo Warranto action.

- Thomas sued MCBOS in the "Sweeps" action.

- Thomas fought with MCBOS over the appointment of special prosecutors.

Each of the above disputes and rulings limited the representation that Thomas, Aubuchon and Alexander could give to their clients in the RICO case.[47]   Their judgment was limited by their own self interest and personal animosity.

### 5.    Ethical Violation #19
### (Thomas, Aubuchon and Alexander) Disobeying an Obligation Under a Rule of a Tribunal

Arizona Supreme Court Rule 48(l) provides:

> **Immunity from Civil Suit.** Communications to the court, state bar, commission, hearing committees or hearing officers, mediators, the client protection fund, the peer review committee, the fee arbitration program, the committee on the Rules of Professional Conduct, monitors of the Member Assistance or Law Office Management Assistance Programs, probable cause panelists or state bar staff relating to lawyer misconduct, lack of professionalism or disability, and testimony given in the proceedings shall be absolutely privileged conduct, **and no civil action predicated thereon may be instituted against any complainant or witness.** Members of the board, commission, hearing committees or hearing officers, mediators, the peer review committee, client protection fund trustees and staff, fee arbitration committee arbitrators and staff, the ethics committee, monitors of the Member Assistance or Law Office Management Assistance Programs, probable cause panelists, state bar staff shall be immune from suit for any conduct in the course of their official duties. (emphasis added)

---

[47] As noted above, it is difficult to determine who was the client in the RICO action.  It is clear that at least for a period of time, Thomas, Aubuchon and Alexander sought to represent the sheriff.  Such representation of the sheriff was not authorized by law.

55

Thomas, Aubuchon and Alexander violated Rule 48(l) by predicating the RICO action in part on alleged Bar complaints or statements to the Bar about Thomas and other MCAO lawyers.  By violating that rule they violated ER 3.4(c), which states that a lawyer shall not knowingly violate an obligation under the rules of a tribunal.

**6.    Ethical Violation #20**
**(Thomas, Aubuchon and Alexander) Conduct Prejudicial to the Administration of Justice**

Thomas, Aubuchon and Alexander sued four judges of the Maricopa Superior Court concerning their decisions in various matters.  By doing so they sought damages against members of the judicial branch of government for carrying out their obligations and duties.  Even if those judges had made decisions in error they were immune from civil liability.  *Ashelman v. Pope*, 793 F.2d 1072, 1075 (9th Cir. 1986). The RICO suit was an unlawful effort to intrude upon the decision making of judges and to intimidate them and retaliate against them.  In doing so Thomas, Aubuchon and Alexander violated ER 8.4(d).  Furthermore, the RICO suit was an attempt by Thomas, Aubuchon and Alexander to silence the judges through misuse of their power.

**G.    *Criminal Prosecution of Mary Rose Wilcox.***

In January 2010, a grand jury returned an indictment charging Supervisor Wilcox with numerous crimes. MCAO initiated this matter, but it was transferred to Sheila Polk (Yavapai County Attorney) along with the *Stapley I* matter and other investigations.   Thomas took the Wilcox matter back, as described above, in

1 September 2009.  The Wilcox matter was transferred to the Gila County Attorney,
2 Daisy Flores, as was *Stapley II* in March 2010.

3      As with the other investigations, it is unknown why the investigation of Wilcox
4 was commenced.  At the time the indictment was returned against Wilcox, Thomas
5 and Aubuchon had sued Wilcox along with other defendants for damages caused by
6 their alleged violations of the RICO statute.  As noted above, Thomas alleged in the
7 RICO Complaint that the defendants had threatened his livelihood by bringing Bar
8 complaints against him, had threatened to sue him and his wife to recover legal fees,
9 and had conspired to cut the funding of MCAO by $6,000,000.   As analyzed below,
10 filing criminal charges against someone the prosecutor is suing civilly is prejudicial to
11 the administration of justice in part because the prosecutor can use the criminal case
12 to leverage a favorable settlement of the civil case for the prosecutor's benefit.

13

14

15          **1.     Ethical Violation #21**
16                 **(Thomas and Aubuchon)  Conflicts of Interest**

17      Thomas and Aubuchon violated ER 1.7(a)(2) in bringing criminal charges
18 against Supervisor Wilcox.  First, they had a concurrent conflict of interest because
19 they had a pending civil case seeking damages caused to Thomas and then filed
20 charges against her.  Second, the analysis of conflicts stated in Ethical Violation 14
21 applies here.

22      Furthermore, in February 2010, Judge Leonardo of the Pinal County Superior
23 Court ruled that Thomas and his office could not serve as prosecutors in the Wilcox
24 case.
25

As discussed below in Ethical Violation 22, Thomas and Aubuchon also violated ER 4.4(a) by charging Wilcox.

**H.  *Charging Stapley II (and an Additional Charge regarding the Wilcox case).***

On December 7, 2009, Thomas and Aubuchon obtained a second grand jury indictment against Stapley. (*Stapley II*)[48]   Thomas had earlier handed off the investigation of this matter to Yavapai County Attorney Sheila Polk, but Thomas took it back from her in September 2009.

The *Stapely II* indictment alleges three areas of conduct upon which the charges were filed: Stapley's use of contributions in his campaign to be elected to an office in the National Association of Counties; obtaining a loan by fraud; and financial disclosure violations.  There were 27 counts in the indictment.  The court dismissed this case on March 15, 2010, on motion of Thomas.  Thomas made this motion, through deputy county attorney Kittredge, because Judge Leonardo had ruled in the case against Wilcox that Thomas and his office had a conflict of interest in that matter.   The motion stated that the State intended to have a special prosecutor review and decide about the prosecution.

Before the dismissal, the indictment in *Stapley II* was brought by Thomas as County Attorney and signed by Aubuchon.

When the *Stapley II* and *Wilcox* indictments were filed Thomas and Aubuchon had sued Stapley and Wilcox among others in the federal RICO action above.

---

[48] *State v. Stapley,* No. CR 2009-007891.

Thomas and Aubuchon brought a criminal case against persons they had sued seeking civil damages.

### 1.   Ethical Violation #22
     (Thomas and Aubuchon)  Filing Charges Against Stapley and
     Wilcox to Embarrass or Burden

ER 4.4(a) states that in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person.   Thomas and Aubuchon violated this rule again in charging Wilcox and Stapley in this second case.   There was no substantial purpose to file the charges against each supervisor other than to burden and embarrass each of them. These prosecutions were not done to seek justice but rather to intimidate the Board and to pursue the political and personal interests of Thomas.   When Thomas filed charges against Stapley and against Supervisor Wilcox in December, 2009, Thomas and the Board were involved in three civil lawsuits against each other: 1) the Dec Action; 2) the Sweeps case; and 3) the RICO case.   Additionally, Thomas had fought with the Board over the appointment of special prosecutors, and the hiring of Thomas Irvine. Thomas and Aubuchon had also lost their fight to investigate what they believed was a conspiracy in the Court Tower matter.  All of this evidence shows that Thomas and Aubuchon charged Stapley and Wilcox for no substantial purpose other than to embarrass and burden these two political officials.

## 2.    Ethical Violation #23
### (Thomas and Aubuchon) Conflicts of Interest

Thomas and Aubuchon violated ER 1.7(a)(2) in bringing charges against Stapley in December 2009.  First, they had a concurrent conflict of interest because they had a pending civil case seeking damages Stapley and others caused Thomas, when they filed criminal charges against Stapley.  Second, they had a conflict for all the above reasons that limited their representation in the RICO action.

Thomas and Aubuchon also had a conflict of interest in pursuing criminal charges against Stapley in this second indictment for all the same reasons their bringing the first criminal case against Stapley, and the RICO action naming Stapley was a conflict of interest in violation of ER 1.7(a)(2).

### I. *Charging of Judge Gary Donahoe.*

Aubuchon and an MCSO investigator filed a criminal case against Judge Donahoe on December 9, 2009.  The complaint was signed by Aubuchon and the investigator, Gabe Almanza.  It charged the judge with hindering, obstruction and bribery.  Attached to the complaint was a probable cause statement.  The probable cause statement was drafted by Detective Brandon Luth directly from a complaint that Deputy Hendershott had written to the Judicial Qualifications Committee about Judge Donahoe.  There was no investigation in this matter.  The evidence indicates that Aubuchon attempted to file the charges on December 8, 2009.

Thomas and Aubuchon wanted to file the charges against Judge Donahoe because he had scheduled a hearing for the afternoon of December 9, 2009 regarding a motion filed by attorney Edward Novak on behalf of the County.  The motion sought

an order removing MCAO from all criminal matters involving Maricopa County employees. Thomas, Aubuchon, and others, believed that Judge Donahoe would recuse himself from hearing that motion if they filed criminal charges against him.

There is evidence that Chief Hendershott called Sgt. Rich Johnson about filing a case against Donahoe on the afternoon of December 8, 2009. MCSO Sergeant Brandon Luth and Sgt. Johnson both stated that they met with MCSO personnel and they called Aubuchon on the afternoon of December 8, 2009, to ask her what was going on and what they needed to charge. Aubuchon told him they needed a Form 4, a DR (departmental report) and a probable cause statement. Aubuchon told him that they would have to figure out what they were going to charge Judge Donahoe with, "probably hindering, bribery and theft by extortion." Sgt. Luth told her they did not have a case put together. Sgt. Luth stated that Aubuchon knew no investigation had been done to support the criminal charges. Sgt. Luth's orders were to put the case together and get it filed with an Initial Advisement judge that evening.

Sgt. Luth said that later in the afternoon of December 8, 2009, he, Aubuchon, and sheriff's deputies Terry Young, Rich Johnson and Chief Hendershott met. Sgt. Luth said that Hendershott told them about the racketeering lawsuit, and that they thought Judge Donahoe was going to throw MCAO off all county investigations. Hendershott said that he had met with Thomas, Aubuchon, and Arpaio, and that Arpaio came up with the idea of charging the judge. Hendershott told Sgt. Luth to use his judicial complaint letter for the Form 4. Hendershott printed off the complaint and wrote the charges on it. Hendershott told them to describe the

"benefit" that Judge Donahoe received for his illegal conduct as the Court Tower. In other words, the bribe Judge Donahoe was receiving was a new court building.

At about 5:00 p.m. Sgt. Luth took the documents to Aubuchon. She read them. She said that "it worked for her." Aubuchon signed the complaint as Deputy County Attorney. Aubuchon knew that no criminal investigation of the alleged charges had occurred and that there was no factual basis for the charges.

Aubuchon attempted to have an investigator from MCAO file the complaint in Superior Court in the late afternoon or early evening of December 8, 2009. No MCAO investigator involved would file the complaint because they had not been involved in the matter. When no MCAO investigator would sign the complaint and "walk it through" Aubuchon turned to the sheriff's office to assist her in filing it. Sgt. Luth refused to file the complaint against Judge Donahoe because he did not want to answer questions by the court about the case when it was filed. The complaint was filed in the morning of December 9, 2009. Detective Gabriel Almanza signed it under oath. Detective Luth stated that he told Almanza to sign it, but Almanza had not been involved in drafting the complaint and he had no knowledge as to the truth or falsity of the complaint.

The evidence indicates that the only attorneys in MCAO involved in the drafting of the complaint against Judge Donahoe were Andrew Thomas and Lisa Aubuchon. No other attorney has admitted involvement, and virtually each MCAO deputy interviewed stated he or she was shocked when they heard Judge Donahoe had been charged.

1.     **Ethical Violation #24
(Thomas and Aubuchon) Prosecuting a Criminal Charge
Without Probable Cause**

ER 3.8(a) states that a prosecutor in a criminal case shall refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause. Thomas and Aubuchon knew that the each of the charges against Judge Donahoe was not supported by probable cause.  There was no police or sheriff's investigation into the matter.   The basis for the criminal charges was an unsupported judicial complaint written by Hendershott that itself failed to allege any criminal activity and failed to identify any criminal statute.

Specifically, there was and is no evidence that Judge Donahoe engaged in bribery, hindrance or obstruction.  Each of these alleged crimes is discussed below.

*Bribery.* A.R.S. § 13-2602 defines bribery as:

Bribery of a public servant or party officer;

A. A person commits bribery of a public servant or party officer if with corrupt intent:

1. Such person offers, confers or agrees to confer any benefit upon a public servant or party officer with the intent to influence the public servant's or party officer's vote, opinion, judgment, exercise of discretion or other action in his official capacity as a public servant or party officer; or

2. While a public servant or party officer, such person solicits, accepts or agrees to accept any benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant or party officer may thereby be influenced.

B. It is no defense to a prosecution under this section that a person sought to be influenced was not qualified to act in the desired way because such person had not yet assumed office, lacked jurisdiction or for any other reason.

### C. Bribery of a public servant or party officer is a class 4 felony.

There was no evidence that Judge Donahoe acted with corrupt intent. The probable cause ("PC") statement attached to the complaint does not describe any corrupt intent by Judge Donahoe. At the very worst, the PC statement alleges that Judge Donahoe was "biased" against Sheriff Arpaio; but bias is not evidence of corrupt intent. Further, there is no evidence supporting the conclusion that Judge Donahoe was actually biased against the county attorney or the county sheriff.

There was no evidence described in the PC statement nor was there any evidence that Judge Donahoe solicited, accepted or agreed to accept any benefit. One theory that has been advanced by Thomas' attorneys is that the benefit to Judge Donahoe was:

- His keeping his position as Presiding Criminal Court Judge;

- Maintaining a beneficial relationship with the Presiding Judge of Maricopa county; and

- Allowing the Superior Court to benefit from funding by the Board for the court tower as well as other projects.[49]

There is no evidence that Judge Donahoe's position as Presiding Criminal Court Judge was in any jeopardy if he decided issues in a certain manner. There is no evidence that Judge Donahoe desired or sought to maintain a beneficial relationship with Judge Mundell. There is no evidence that Judge Mundell ever communicated with Judge Donahoe about her desires regarding the court tower. Further, there is

---

[49] Legal Opinion of Bob Barr, Esq., 7-10, August 5, 2010.

1 no evidence that Judge Donahoe cared in the slightest about whether the court tower
2 was built.

3   There was no investigation into these alleged benefits.  For instance, there was
4 no interview of any witness about whether Judge Donahoe cared about keeping his
5 position as presiding criminal court judge or whether he cared about any relationship
6 he might have with Judge Mundell.  Furthermore, there was no investigation into
7 whether Judge Donahoe would actually move into the new court tower when built.  In
8 fact, Judge Donahoe planned to retire before completion of the court tower.  There
9 was no evidence described in the PC Statement nor was there any evidence that
10 Judge Donahoe made a decision or issued a ruling because of a benefit he solicited,
11
12 accepted or agreed to accept.

13   There was and is no evidence at all, much less probable cause to believe that
14 Judge Donahoe engaged in bribery.

15   ***Hindering.***  A.R.S. § 13-2512 defines Hindering as:

16   Hindering prosecution in the first degree; classification

17   A. A person commits hindering prosecution in the first degree if,
18   with the intent to hinder the apprehension, prosecution, conviction
   or punishment of another for any felony, the person renders
19   assistance to the other person.

20   B. Hindering prosecution in the first degree is a class 5 felony
   [except in situations inapplicable here].
21

22   There was no evidence described in the PC Statement nor was there any
23 evidence that Judge Donahoe hindered the apprehension, prosecution, conviction or
24 punishment of anyone for any felony.  Thomas's attorneys have argued that there
25 was evidence of Hindering by Judge Donahoe because he had:

- Disqualified the Maricopa County Attorney from the Court Tower investigation;

- Failed to transfer matters to a Superior Court Division that "could document its lack of a conflict of interest and/or to courts in other Arizona counties, which would not be burdened with the same conflicts that plagued the Maricopa County judges;" and

- Selected cases by method of cherry picking rather than by the "normal, random assignment process."[50]

The charges against Judge Donahoe do not specify whom he intended to help avoid prosecution, or conviction and for what crime. In his order disqualifying the MCAO from handling the court tower investigation Judge Donahoe did not disqualify MCSO, or order an end to the investigation. He simply disqualified MCAO based upon its conflict. No investigation was performed concerning the reasons that Judge Donahoe disqualified MCAO from the court tower investigation beyond reading his order. However, the criminal charges against him assume that there was some hidden motive not stated in his order. Instead of conducting any investigation into Judge Donahoe's motive for hindering an investigation, Thomas and Aubuchon filed unsupported charges.

There was and is no evidence at all, much less probable cause, to believe that Judge Donahoe engaged in hindering.

**Obstruction:** A.R.S. § 13-2409 defines Obstruction as:

A person who knowingly attempts by means of bribery, misrepresentation, intimidation or force or threats of force to obstruct, delay or prevent the communication of information or testimony relating to a violation of any criminal statute to a peace

---

[50] Legal Opinion of Bob Barr, Esq. 10-11, August 5, 2010.

officer, magistrate, prosecutor or grand jury or who knowingly injures another in his person or property on account of the giving by the latter or by any other person of any such information or testimony to a peace officer, magistrate, prosecutor or grand jury is guilty of a class 5 felony.

There was no evidence described in the PC Statement, nor was there any evidence, that Judge Donahoe attempted to use bribery, misrepresentation, intimidation, force or threats of force to delay or prevent the communication of information about a crime to any peace officer, prosecutor or grand jury. Thomas's attorneys have argued that there was evidence of Obstruction by Judge Donahoe because he had:

- Inappropriately intervened in a case (which is believed to be Conley Wolfswinkel's motion to controvert a search warrant);

- Prevented the MCAO from assisting the MCSO and the grand jury from investigating the court tower, Donald Stapley and Conley Wolfswinkel;

- Delayed and/or prevented MCSO from obtaining information related to the violation of criminal statutes.

Judge Donahoe's conduct was not Obstruction. Obstruction requires three people: a defendant [Donahoe]; a law enforcement officer, or other specified official; and another, prospective informant or witness. *Walker v. Superior Court In and For County of Navajo*, 956 P.2d 1246 (Ariz. App. 1998). There must be evidence that Judge Donahoe attempted to prevent some person from communicating with a law enforcement officer or grand jury. There never was any such evidence.

Judge Donahoe was not obstructing any witness from doing anything. When he disqualified MCAO from the court tower investigation, Judge Donahoe simply

ruled MCAO could not be involved.  There was no prospective informant or witness whom he was preventing from communicating to anyone.   Furthermore, Judge Donahoe's quashing of the grand jury subpoena did not prevent the communication of any information to law enforcement.   It was a ruling that the subpoena was invalid.  Such a ruling does not prevent anyone from communicating with the police; it simply means that the subpoena cannot be enforced.

There was and is no evidence at all, much less probable cause, to believe that Judge Donahoe engaged in obstruction.   Thomas and Aubuchon knew that the charges against Judge Donahoe were not supported by probable cause.   The charges were filed for improper and unlawful reasons.

**2.    Ethical Violation #25
(Thomas and Aubuchon) Using Means That Have No Other
Purpose than To Burden, Delay or Embarrass a Person**

ER 4.4(a) states that in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person.  The purpose of charging Judge Donahoe was to burden or embarrass him in order that he would remove himself from the matter he was handling the afternoon of December 9, 2010.  The purpose was also to burden and embarrass Judge Donahoe in retaliation for decisions that Thomas and Aubuchon did not like and did not agree with.

### 3.    Ethical Violation #26
(Thomas and Aubuchon) Engaging in Conduct Involving
Dishonesty

Aubuchon signed the complaint unlawfully charging Judge Donahoe with three felonies.   She and Thomas knew that the charges were false and that they were brought without the benefit of any investigation or evidence.   Aubuchon arranged for a Deputy Sheriff, Gabe Almanza, to sign the criminal complaint under oath.  By doing so Aubuchon engaged in dishonesty, misrepresentation, deceit and fraud in violation of ER 8.4(c).  Thomas had direct knowledge of what Aubuchon was doing, evidenced at least by his press release announcing that Judge Donahoe had been charged.  He also knew because Chief of Investigators Stribling talked to Thomas about the filing of the charges the night before they were filed.  Thomas also engaged in dishonesty by approving and ratifying Aubuchon's filing of false charges, and he thereby violated ER 8.4(c).

### 4.    Ethical Violation #27
(Thomas and Aubuchon) Engaging in Criminal Conduct

ER 8.4(b) states that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.  Thomas and Aubuchon engaged in perjury, a criminal act that reflects adversely on their honesty, trustworthiness or fitness as a lawyer. Perjury is defined by A.R.S. § 13-2702:

A.    A person commits perjury by making either:

1. A false sworn statement in regard to a material issue, believing it to be false.

69

1    2. A false unsworn declaration, certificate, verification or statement
2    in regard to a material issue that the person subscribes as true
     under penalty of perjury, believing it to be false.

3    B. Perjury is a class 4 felony.

4

5    On December 9, 2009, Thomas and Aubuchon knew that the criminal

6    complaint against Judge Donahoe was to be filed in Superior Court.  Both of them

7    knew that the complaint was to be signed by Gabriel Almanza under oath.  Thomas

8    and Aubuchon knew that Detective Almanza would be swearing to facts and

9    allegations against Judge Donahoe that were false.  Thomas and Aubuchon knew

10   that Detective Almanza signed the complaint that was false and they knew that it was

11   filed in Superior Court.  Such complaint was a "sworn statement" as defined by

12   A.R.S. § 13-1701.

13   Under A.R.S. § 13-303, Thomas and Aubuchon are criminally accountable for

14   the conduct of Detective Almanza because they acted with the culpable mental state

15   for perjury and caused another, whether or not such other person was capable of

16   forming the culpable mental state, to engage in perjury.

17

18   Thomas and Aubuchon violated ER 8.4(b).

19

20   **5.    Ethical Violation #28**
           **(Thomas and Aubuchon) Engaging in Criminal Conduct**

21

22   Thomas and Aubuchon also violated ER 8.4(b) by engaging in conduct that

23   violated a federal criminal statute, 18 U.S.C. § 241.  That statute provides in

24   pertinent part:

25   If two or more persons conspire to injure, oppress, threaten, or
     intimidate any person in any State, Territory, Commonwealth,

70

> Possession, or District in the free exercise or enjoyment of any
> right or privilege secured to him by the Constitution or laws of the
> United States, or because of his having so exercised the same; . . .
>
> They shall be fined under this title or imprisoned not more than
> ten years, or both.

Thomas and Aubuchon conspired with each other and with others to injure, oppress, threaten or intimidate Judge Donahoe in the free exercise of his First Amendment rights to freedom of speech, a right or privilege secured to him by the U.S. Constitution and laws of the U.S., or they did so injure, oppress, threaten or intimidate Judge Donahoe because he had exercised his right to freedom of speech.

Under 18 U.S.C. § 241 the gravamen of the violation is the conspiracy to injure, oppress, threaten or intimidate someone from exercising a right under the U.S. Constitution. *See U.S. v. Lanier*, 520 U.S. 259 (1997). In order to be criminally liable under this statute it does not need to be shown that any actual injury, oppression or intimidation occurred. It is the conspiracy to do so which is prohibited.

A judge when issuing an opinion or a ruling is exercising his First Amendment right to freedom of speech. *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000). The intent of Thomas, Aubuchon and others was to muzzle Judge Donahoe so that he would not rule on the motion to be heard on the afternoon of December 9, 2009.

Judge Donahoe also had a constitutional right to engage in his profession and do his job as a judge. A conspiracy against a public officer in the performance of his duties is a violation of 18 U.S.C. § 241. *U.S. v. Patrick*, 54 F. 338, 348-49 (C.C. Tenn. 1893). *See also U.S. v. Davis*, 103 F. 457 (C.C. Tenn. 1900) (conspiracy to deprive U.S. Marshal and Deputy Marshal of their constitutional right to arrest a person on

71

legal process violates the statute).  A judge when hearing a motion is exercising his constitutional right to perform his function as a public officer.  By conspiring to charge Judge Donahoe with a crime unsupported by any evidence, Thomas and Aubuchon violated 18 U.S.C. § 241.

### 6.    Ethical Violation #29
### (Thomas and Aubuchon) Conflicts of Interest

Thomas and Aubuchon violated ER 1.7(a)(2) in bringing charges against Judge Donahoe.  First, they had a concurrent conflict of interest because they had a pending civil case against Judge Donahoe, among others, seeking damages caused to Thomas at the time they then filed charges against Judge Donahoe.  Second, they had a conflict because Judge Donahoe had ruled against them in disqualifying MCAO from the Court Tower grand jury matter and quashing the subpoena.  Their personal animosity toward Judge Donahoe limited their representation and judgment as attorneys for the State.

### 7.    Ethical Violation #30
### (Thomas and Aubuchon) Conduct Prejudicial to the
### Administration of Justice

Thomas and Aubuchon engaged in conduct prejudicial to the administration of justice in violation of ER 8.4(d) by charging Judge Donahoe with crimes in order to burden him to the point where he recused himself from the pending motion.

### J. *Grand Jury Matters in 2010.*

On January 4, 2010, Aubuchon began a presentation to the Grand Jury about two areas: 1) allegations that Stephen Wetzel, Andrew Kunasek and Sandi Wilson had illegally used public monies on two separate occasions to conduct sweeps for electronic listening devices at county offices; and 2) allegations that Judge Donahoe, Thomas Irvine and County Manager David Smith had illegally conspired to hinder prosecution and obstruct a criminal investigation involving the court tower. Testimony was taken on January 4, 2010. There were only two witnesses, Detective Halverson and Chief Deputy Hendershott. After the testimony, the Grand Jury asked Aubuchon for a draft indictment. Aubuchon provided a draft indictment, but the Grand Jury did not reach any conclusion.

In the meantime, Judge Donahoe requested and received a stay on the prosecution against him. Additionally, Judge Leonardo had disqualified MCAO from prosecuting the case against Mary Rose Wilcox.

On March 3, 2010, Aubuchon appeared in front of the Grand Jury. She advised them of the stay in the Donahoe matter and of the disqualification in the Wilcox case. She asked that the Grand Jury return the bug sweep and court tower matters to MCAO so that when a special prosecutor was found, that prosecutor could make a determination how to proceed. The Grand Jury asked for advice as to how it could proceed. They were advised that they could ask for a draft indictment, end the inquiry, or call for more witnesses or evidence. The Grand Jury voted to end the inquiry.

In March 2010, Gila County Attorney Daisy Flores agreed to review the *Wilcox* and *Stapley II* matters which had been dismissed by MCAO.

On April 1, 2010, Thomas announced his resignation as County Attorney which he stated was effective April 6, 2010.

On April 2, 2010, Aubuchon sent Ms. Flores a letter, memorandum and departmental report about the bug sweep investigation. She wrote in her memo that the matter was presented to the county grand jury as part of an overall investigation into local corruption. She wrote that the grand jurors had not finished deliberating on an indictment when a judge entered a stay as to one of the suspects, Judge Donahoe. Aubuchon stated that she asked the grand jurors to stop considering the matter until that issue was resolved. She wrote further that her office was found to have a conflict in the Mary Rose Wilcox case and that the office decided to dismiss the matters relating to the other county officials. She said that if Ms. Flores decided to go forward with the charges, parts of the grand jury presentation may need to be accessed or disclosed after court order as it was all in a sealed grand jury proceeding under number 494 GJ 156, January 4, 2010. Aubuchon did not tell Ms. Flores that, in fact, the grand jury had voted to end the inquiry.

### 1.   Ethical Violation #31 (Thomas and Aubuchon) Conflicts of Interest

Thomas and Aubuchon violated ER 1.7(a)(2) in pursuing a grand jury investigation of Judge Donahoe, Thomas Irvine, Andrew Kunasek, David Smith and Sandi Wilson. First, they had a concurrent conflict of interest because they had filed

1  a pending civil RICO case against these individuals seeking damages caused to

2  Thomas, and then they pursued a criminal investigation of them.  Second, they had a

3  conflict for all the same reasons noted above that limited her representation in the

4  RICO action.    *See* Ethical Violation 14 above.    Additionally, Thomas's and

5  Aubuchon's representation of the State was limited by their personal animosity

6  toward these individuals.

7

8

9  ## 2.    Ethical Violation #32
        (Aubuchon) Dishonesty and Misrepresentation

10

11  Aubuchon should never have disclosed to Ms. Flores any matters attendant the

12  grand jury.[51]    However, once she did so, she had to be honest about what she

13  revealed.  Aubuchon engaged in dishonesty and misrepresentation in violation of ER

14  8.4(c) because she knowingly failed to tell Ms. Flores that the grand jury had voted to

15  end the inquiry.  Given that Aubuchon had told Ms. Flores that she had presented

16  matters to the grand jury concerning local corruption, her failing to inform Ms. Flores

17  that the grand jury had ended the inquiry was misleading and dishonest.

18

19

20

21  ## IV.  CONCLUSION

22  Based upon the above, Independent Bar Counsel recommends that the

23  Probable Cause Panelist find that there is probable cause to believe the above

24

25  ---
[51] A.R.S. §_13-2812 criminalizes disclosure of matters attendant a grand jury proceeding unless a court order permits one to do so.

1 allegations and to approve the filing of a formal complaint against Andrew Thomas,

2 Lisa Aubuchon and Rachel Alexander.

3

4     **RESPECTFULLY SUBMITTED** this *23rd* day of *Nov*, 2010.

5

6

7     John S. Gleason
      Independent Bar Counsel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25